## 2003 VT 93

### In re JOHN A. RUSSELL CORP. and Crushed Rock Inc.

### In re Appeal of Gale and Frank LiCausi, John Furneaux, Andrea McCormack, Eric Jensen and Lisa Chapman

### In re Appeal of John Russell Corp.

[838 A.2d 906]

Nos. 99-418, 02-019 & 02-102

¶ 1. October 15, 2003. In these consolidated appeals, we review a decision of the Environmental Board and two rulings of the Environmental Court concerning proposals to construct an asphalt manufacturing plant in the Town of Clarendon. In Docket No. 1999-418, appellant John Russell Corp. contends that the Board erred in denying an Act 250 permit based on a finding that the proposal was not in conformity with the Town plan, asserting: (1) there was no Town plan in effect at the time of the Board's ruling; and (2) even if there was a valid plan, the relevant provisions relied upon by the Board cannot be construed to find nonconformity. We agree with the second contention, and therefore reverse.

¶ 2. In Docket No. 2002-019, appellants Gale and Frank LiCausi contend that the Environmental Court erred in granting a conditional use permit for the project, asserting: (1) the conditional use provision of Town's zoning ordinance conflicts with state law; (2) the court lacked the authority to address the issue; and (3) the evidence failed to support the court's finding that the proposal would not adversely affect the character of the area. We agree with the third contention, in part, and reverse and remand.

¶ 3. In Docket No. 2002-102, appellant John Russell Corp. contends that the Environmental Court erred in concluding that its proposal to build the plant in a different location failed to comply with the height limitations in the Town's zoning ordinance. We affirm the ruling.

¶ 4. The background for all three appeals may be briefly summarized. Additional facts will be presented as necessary in the discussion which follows. Russell owns a 400- to 500-hundred-acre parcel of land in the Clarendon River valley on the west side of Route 7, on which it operates a gravel pit and stone quarry under a conditional use permit issued in 1983. Russell also holds an Act 250 permit for the existing operation.

¶ 5. In 1998, Russell applied for a conditional use permit to construct a bituminous asphalt plant on a twenty-five- to thirty-acre portion of the property. The proposed hot mix plant would consist of a rotary dryer, a batch tower and a pugmill mixer, a bag house, and a smokestack. Additional components would include a scale house, a lab/control building, and three tanks for storage of associated fuel and asphalt cement, two of 15,000 gallons and one of 10,000 gallons. The plant height would be fifty-five feet, with a sixty-five and a half foot smokestack.

¶ 6. The area immediately surrounding the site of the proposed asphalt plant contains woodlands, agricultural uses including farms with silos and hayfields, several residences, a campground near the river, a repair shop, and a former retail building

now used as a church. A deer yard is located near the project site, although the plant would not be operated in the winter when the yard is in use. None of the other uses in the area incorporate a smokestack. Access to the site is from Route 133, which affords views of mixed residential, agricultural, and commercial uses along the valley floor, and wooded hillsides above.

¶ 7. The zoning board of adjustment (ZBA) granted Russell's application for a conditional use permit (CUP). Several neighbors, including Gale and Frank LiCausi, appealed the ruling to the Environmental Court. Following several preliminary rulings and an evidentiary hearing, the court issued a written decision granting the application, with a number of conditions designed to mitigate the plant's impact on the area. This appeal (Docket No. 2002-019) followed.

¶ 8. While the conditional use application was proceeding, Russell applied for an Act 250 permit. In December 1998, the District Commission denied the application, and Russell appealed to the Environmental Board. In August 1999, the Board issued a decision, denying the application for noncompliance with 10 V.S.A. § 6086(a)(10) (Criterion 10),[1] finding that the proposal was inconsistent with the 1995 Town plan then in effect. Russell appealed the Board's decision to this Court. About a year later, while the appeal was pending, Russell and the Vermont Attorney General filed a joint motion to remand the matter to the Board to determine the status of the Town plan, which had expired in June 2000. See 24 V.S.A. § 4387(a) (town plan expires every five years unless readopted or a new plan is adopted). In an order

dated September 25, 2000, we granted the motion. The Board, in turn, remanded the case to the District Commission, which ruled that the 1995 plan continued to apply to the application. Russell appealed to the Board, which issued a new decision in January 2002. The Board concluded that the 2000 Town plan, which the selectboard had adopted in November 2000, applied to Russell's permit application under the "pending ordinance" doctrine and reaffirmed its decision that the proposal was inconsistent with the 2000 plan, which was identical in all pertinent respects to the 1995 plan.[2]

---

[2] The "pending ordinance" doctrine permits a town to amend local land use regulations without the threat of landowners racing to "beat the clock" by filing an application and thus obtaining vested rights under existing regulations. The doctrine generally provides that an application filed after official notice that an amendment is pending will be governed by the amended provision if it is enacted within a certain time after the date of notice. See In re Handy, 171 Vt. 336, 350, 764 A.2d 1226, 1239 (2000) ("jurisdictions keying vested rights to the date of application generally have an exception for cases where a zoning change is pending on that date"); see also 24 V.S.A. § 4443(d) (zoning permit applications filed within 150 days of public notice of first hearing on bylaw amendment must be reviewed under amended bylaw unless it has not been adopted within 150 days or has been rejected). Here, the Board decided to apply the pending ordinance doctrine to town plans, ruling that the pendency period for the proposed 2000 Town plan commenced on September 15, 2000, when the selectboard first published notice of a public hearing on readoption of the 1995 plan. Treating the date of September 25, 2000, when jurisdiction was returned to the Board by this Court's remand order, as the equivalent

---

[1] That section provides, in pertinent part, that before issuing a permit, the Board or District Commission must find that the development "[i]s in conformance with any duly adopted local or regional plan."

This appeal (Docket No. 1999-418) followed. The Vermont Attorney General's Office has filed an amicus curiae brief in support of appellees Town of Clarendon and Clarendon Planning Commission.

¶ 9. While the foregoing matters were proceeding, Russell filed another application with the ZBA, seeking a zoning permit to construct the asphalt plant on the east side of Route 7B in the Town's commercial-industrial district. The ZBA denied the application on the ground that the proposal violated the height limitations applicable in the district. Russell appealed to the Environmental Court, which denied the application on the same basis. This appeal (Docket No. 2002-102) followed.

¶ 10. Because of the obvious association of subject matter, we have consolidated the three appeals for purposes of argument and decision.

### Docket No. 1999-418

¶ 11. Russell first contends that the Board erred in ruling that the application was governed by the 2000 Town plan. More specifically, Russell argues that the Board erred in determining that the "pending ordinance" rule made the 2000 plan applicable to the proposal. Alternatively, assuming that the rule applies, Russell contends that the Board erred in failing to find that its rights had vested prior to the beginning of the pendency period, on September 13, 2000, when it filed the joint motion to remand. Thus, because there was allegedly no valid plan in effect or applicable to the development proposal after the remand, the Board could not have denied the application on the basis of nonconformity with the plan.

¶ 12. We start with the undisputed conclusion that the original application

of the date of application, the Board determined that the proposal would be governed by the 2000 plan, which was eventually adopted in November 2000.

was governed by the 1995 plan. In *In re Preseault*, 132 Vt. 471, 474, 321 A.2d 65, 66 (1974), we held that a project's nonconformance with a town plan adopted after a developer had applied for an Act 250 permit could not be the basis of a permit denial under 10 V.S.A. § 6086(a)(10). Subsequently, in *In re Molgano*, 163 Vt. 25, 31-33, 653 A.2d 772, 774-76 (1994), we relied on *Preseault* and *Smith v. Winhall Planning Comm'n*, 140 Vt. 178, 181-82, 436 A.2d 760, 761 (1981) (adopting the "minority" rule that development rights vest under regulations in effect when application is filed), to hold that conformance with a town plan under Act 250 must be "measured with regard to zoning laws in effect at the time of a proper zoning permit application," rather than more restrictive subsequently enacted zoning regulations.

¶ 13. We do not foreclose that an applicant could withdraw an application and resubmit it to take advantage of less restrictive, subsequently enacted regulations. Russell did not, however, withdraw and resubmit, but instead sought to take advantage of the temporary lapse of the Town plan. Under these circumstances, the 1995 plan applies.

¶ 14. We reach the same conclusion based on a variation of the Board's rationale. As indicated above, the provisions of the 1995 and 2000 plans implicated in this appeal are identical. As also indicated above, the Board decided that the 2000 plan applied under the "pending ordinance" doctrine because at the time this Court remanded the case to the Board, the Clarendon Planning Commission had already approved the 2000 plan and submitted it to the Town selectboard, which had noticed a public hearing on it.

¶ 15. Although we discussed the pending ordinance doctrine with respect to a zoning case in *Handy*, 171 Vt. at 350, 764 A.2d at 1238, we did not clearly adopt it in that case. We need not create a general rule here. The statutory scheme anticipates that some period of time may

elapse between the expiration and re-adoption of a town plan, as occurred here, and specifically provides that upon expiration of the plan all bylaws then in effect shall remain in effect until the plan is readopted. 24 V.S.A. § 4387(c). It goes on to state:

> (d) The fact that a plan has not been approved shall not make it inapplicable, except as specifically provided by this chapter. Bylaws, capital budgets and programs shall remain in effect, even if the plan has not been approved.

*Id.* § 4387(d). There is nothing in the chapter on municipal planning and zoning that specifically provides for the effect of an unapproved plan in an Act 250 proceeding. Although the wording is somewhat confusing, we take this statutory section as an expression of the Legislature that a pending plan must be given effect even if it is not yet finally approved. See *Town of Killington v. State*, 172 Vt. 182, 188, 776 A.2d 395, 400 (2001) (paramount goal in construing a statute is to implement the intent of the Legislature). In essence, the plan is retroactive to cover any gap period between the expiration of the old plan and the adoption of the new one. Under § 4387(d), the 2000 plan applied to Russell's application even if the 1995 plan did not.

¶ 16. Turning to the merits, Russell contends that the Board erred in concluding that the project was not in conformance with the Town plan. We have decided a number of cases concerning the question of whether a particular development proposal complies with Criterion 10 of Act 250, which, as noted, requires that the proposal be "in conformance with any duly adopted local or regional plan." 10 V.S.A. § 6086(a)(10). Several key principles emerge from these decisions. First, we will affirm the Board's determination of nonconformity when based on a "specific policy" set forth in

the plan, *In re Green Peak Estates*, 154 Vt. 363, 369, 577 A.2d 676, 679 (1990), and stated in language that "is clear and unqualified, and creates no ambiguity." *In re MBL Assocs.*, 166 Vt. 606, 607, 693 A.2d 698, 700 (1997) (mem.). Broad policy statements phrased as "nonregulatory abstractions," however, may not be given "the legal force of zoning laws," *Molgano*, 163 Vt. at 31, 653 A.2d at 775, which "are designed to implement the town plan, and may provide meaning where the plan is ambiguous." *In re Kisiel*, 172 Vt. 124, 130, 772 A.2d 135, 140 (2000). As succinctly stated in *Smith*, 140 Vt. at 183, 436 A.2d at 762, "[t]he regulations control the plan."

¶ 17. Thus, while we generally "accord great deference to the Board's decision," *Kisiel*, 172 Vt. at 133, 772 A.2d at 141, we have not hesitated to reverse a finding of nonconformity where the plan "sets forth an abstract policy ... but provides no specific standards to enforce the policy," *id.* at 130, 772 A.2d at 140, or is "at best, ambiguous" and in conflict with applicable zoning provisions. *Molgano*, 163 Vt. at 30, 653 A.2d at 775.

¶ 18. The Board's decision that the proposal was not in conformance with the Town plan was based on language in the plan stating that the "purpose" of the "proposed" residential district where the project would be located "is to provide for residential and other compatible uses at densities appropriate with the physical capability of the land and the availability of community facilities and services." The same provision states that planned residential developments and other "techniques for preserving the rural character of these areas are encouraged," and that "[d]evelopment should take place in such a way that any irreplaceable, unique, scarce resources and natural areas are not harmed." The Board concluded that it was "clear" from the provision "read as a whole" that "industrial uses are not compatible with residential uses under the Town Plan," and therefore that the as-

phalt-plant proposal was not in conformance with the plan.

¶ 19. Although the plan evinces a clear intent to protect the rural character of the area and to promote residential and "other compatible uses," we discern no specific policy prohibiting industrial development per se, as the Board concluded. Indeed, the reference to "other compatible uses" implies that uses other than strictly residential development are contemplated, and no alternative uses — including manufacturing or industrial development — are expressly excluded. The only textual evidence cited by the Board in support of its finding that industrial uses are categorically prohibited is a separate section in the plan defining the purpose of the "industrial district" as "discouraging" incompatible uses "such as residential."[3] While this suggests something less than a mandate against residential construction in the industrial district, it sheds no light on whether certain industrial uses would be considered compatible in the separate and distinct residential district, and if so which uses, and why. Accordingly, we cannot find that the plan evinces a sufficiently "specific policy" against industrial development in the district to support the Board's finding of nonconformity. *Green Peak Estates*, 154 Vt. at 369, 577 A.2d at 679. We are thus left with precisely the sort of broad goals lacking in specific policies or standards that we have consis-

tently disallowed as the basis for the denial of a permit under Criterion 10. See *Kisiel*, 172 Vt. at 130, 772 A.2d at 140 ("Absent some objective measure to guide enforcement of the steep-slope prohibition, there was no basis for the Board to conclude that the project was not in compliance with this policy."); *Molgano*, 163 Vt. at 30, 653 A.2d at 775 (broad goal of discouraging transient commercial uses not enforceable basis for denying Act 250 permit).

¶ 20. Two other factors are important to our decision. First, in circumstances like those before us, we have held that the Board may look for guidance outside the plan to any pertinent zoning bylaws. See *Molgano*, 163 Vt. at 30, 653 A.2d at 775 (zoning bylaws are designed to implement plan and may provide meaning where plan is ambiguous).[4] The substance of the applicable zoning bylaws is that compatibility is measured on a case-by-case basis through the application of conditional use standards. We cannot conclude that this method of implementation is inconsistent with the language of the plan. It is, however, directly inconsistent with the Board's determination of the meaning of the plan.

¶ 21. The Board concluded, however, that it could not consider the zoning ordinance to construe the plan because the

---

[3] We also note that the difficulty of ensuring compatibility may be different in an industrial zone where isolated residential uses are surrounded by industrial uses, as opposed to a residential zone where isolated industrial uses are surrounded by residential uses. Indeed the evidence before the Environmental Court in Docket No. 2002-019 indicates that a machine shop industrial use in the district involved here was readily accepted as compatible.

---

[4] Following the decision in *Kisiel*, the Legislature amended Criterion 10 to provide: "In making this finding [of conformance], if the board or district commission finds applicable provisions of the town plan to be ambiguous, the board or district commission, for interpretive purposes, shall consider bylaws, but only to the extent that they implement and are consistent with those provisions, and need not consider any other evidence." 10 V.S.A. § 6086(a)(10). Even if applicable here, the amendment maintains the Board's authority to consult zoning bylaws "for interpretive purposes."

ordinance was adopted sixteen years before the plan. The undisputed evidence was that following the adoption of the plan in 1995, the selectboard put before the citizens of the Town amendments to the zoning ordinance, apparently to better conform the ordinance to the plan. The proposed amendments were defeated by the citizens, keeping the preexisting ordinance in effect. In these unique circumstances, we believe the preexisting zoning ordinance provisions are evidence of the meaning of the plan because the citizens were presumably aware of the plan and preferred to stay with the preexisting implementation scheme.

¶ 22. The second reason is related. The primary language on which the Board relied came at the end of the plan in a final section entitled "CLARENDON TOWN PLAN — FUTURE LAND USE." It states general objectives of land use planning, concluding:

> The following districts — displayed on the attached land use plan map[5] — are proposed to ensure these objectives. They will serve as the basis for zoning regulations in the Town of Clarendon.

The language then describes each proposed district, including the residential district in which this project is located.

---

[5] The map contains the following note: "This map is illustrative and intended for planning purposes only. Land use districts were developed by the members of the Clarendon Planning Commission. Boundaries are approximate and land uses may vary from those depicted." Although there has been no argument that the land involved in this appeal was not intended to be placed in the catch-all residential district, the note undercuts the position of the Board that the district boundaries can be used as clear regulatory dividing lines.

As indicated above, the proposed districts were submitted to the citizens, who rejected them.

¶ 23. It appears from the language that the districts and their descriptions had a very limited purpose in the plan — to serve as a basis for proposed zoning ordinance provisions. We are reluctant to conclude that they were intended to be implemented through Criterion 10. See *Kisiel*, 172 Vt. at 133, 772 A.2d at 142 (plan provision found too ambiguous to use under Criterion 10 because "there is little specificity on how the [alleged] policy should be enforced and, indeed, the enforcement language is quite tentative."). Our reluctance is heightened by the failure of the citizens to approve the proposed districts.

¶ 24. We thus hold that the Board erred in denying the permit on the basis that the proposal was not in conformance with the Town plan.

*Docket No. 2002-019*

¶ 25. As noted earlier, in this docket the Environmental Court granted Russell's application for a CUP, with a number of conditions designed to mitigate the impact of the asphalt plant on the surrounding area. Appellants Gale and Frank LiCausi initially challenge the court's reliance on the conditional use provision of the ordinance, asserting that it is incompatible with the enabling statute. See *In re White*, 155 Vt. 612, 618, 587 A.2d 928, 931 (1990) (municipality's zoning authority must accord with terms and conditions established by state in granting power to zone). Section 423 of the zoning ordinance provides that the ZBA may approve uses in the commercial-residential district "other than those specifically permitted therein, subject to the procedures applicable to conditional use approval set forth in 24 V.S.A. 4407(2)." Section 4407(2) of Title 24 provides that in any zoning district "certain uses" may be permitted only with the approval of the zoning board of adjust-

ment or development review board, and sets forth both mandatory and discretionary standards to which the use must conform.[6]

¶ 26. Appellants contend that in failing to identify specific uses subject to conditional use approval, the zoning provision is inconsistent with language in the enabling statute providing that "certain uses" may be conditionally permitted only with approval of the ZBA, and that "each permitted use" must conform with the specified standards. *Id.* § 4407(2). We are not persuaded that the ordinance contravenes the statute, which suggests simply that some limited number of uses not otherwise permitted in a district may be conditionally approved by the ZBA or the development review board. See Webster's II New Riverside University Dictionary 245 (1988) ("certain" may refer to "an indefinite but limited number"). We discern no requirement that the ordinance specifically list the uses subject to conditional use approval, and conclude that the provision authorizing conditional approval of those uses not otherwise specifically permitted is sufficiently limited to satisfy the statute. Accordingly, we find no basis to invalidate the ordinance as inconsistent with the enabling statute. See *White*, 155 Vt. at 617, 587 A.2d at 931 (declining to invalidate zoning ordinance which failed to specifically incorporate § 4407(2) standards, we noted that we overturn "only those [zoning ordinances] that are clearly unreasonable, irrational, arbitrary, or discriminatory").

¶ 27. Appellants also note that the zoning ordinance sets forth a specific list of permitted and nonpermitted uses in the commercial-residential district, and that asphalt plants are not among the permitted uses. This section does not limit, however, the ZBA's authority to approve an asphalt plant as a conditional use under the separate conditional use provision. Appellants observe further that the ordinance elsewhere sets forth a specific list of uses that may be conditionally allowed in other zoning districts, such as the residential and agricultural-rural districts. We discern no basis to conclude from this that the ordinance may not incorporate a different approach for the commercial-residential district by allowing a CUP for those uses not otherwise permitted.

¶ 28. Lastly in this regard, appellants assert that contrary to the enabling statute and the balance of the zoning ordinance, the conditional use provision at issue provides "an unlimited conditional use authority with no general or specific limitation." On the contrary, by incorporating the general mandatory standards set forth in 24 V.S.A. § 4407(2), the ordinance fully complies with the minimum statutory requirements and enumerates adequate standards to guide the decision of the ZBA and the court in evaluating the project's impact. See *White*, 155 Vt. at 619-20, 587 A.2d at 932 (zoning ordinance complies with § 4407(2) if it incorporates enumerated general standards, which establishes "the floor below which no town can go if it wants to do conditional use zoning").

¶ 29. Appellants next contend that the court lacked authority to consider the conditional use standards of § 4407(2) incorporated by reference in the ordinance because, in granting the CUP, the ZBA did not make specific findings addressed to each of the relevant standards. The court's authority is, of course, only as broad as that of the ZBA, *In re Torres*, 154 Vt. 233, 235, 575 A.2d 193, 195 (1990), but its review is de novo and therefore "whatever the zoning board of

---

[6] Among the general standards "that the proposed conditional use shall not adversely affect" are "[t]he character of the area affected," "[t]raffic on roads and highways in the vicinity," and "[b]ylaws then in effect." 24 V.S.A. § 4407(2)(B), (C), (D).

adjustment ... might have done with an application properly before it, the superior court may also do if an appeal is duly perfected." *Id.* at 236, 575 A.2d at 195. There is no indication here that the conditional use application was not properly before the ZBA or acted on by that body. Accordingly, the ZBA's failure to make specific findings on certain criteria did not preclude the court from doing so.

¶ 30. Finally, appellants contend that the court erred in concluding that the asphalt plant would not adversely affect the character of the area, as required by the statutory and municipal conditional use standards. See 24 V.S.A. § 4407(2)(B); Town of Clarendon Zoning Bylaws § 423. Our review of the Environmental Court's determination of whether there is material adverse effect is generally deferential: we will uphold the court's determination unless clearly erroneous. *In re Miller,* 170 Vt. 64, 69, 742 A.2d 1219, 1223 (1999); *In re Walker,* 156 Vt. 639, 639, 588 A.2d 1058, 1059 (1991) (mem.). Here, however, the Environmental Court in applying the material-adverse-effect standard neglected to consider the possible cumulative impacts of adding the asphalt plant to the existing quarry operation, and therefore its ruling cannot stand.

¶ 31. The record indicates that the predominant character of the area is rural and agricultural, marked by extensive woodlands and hills, working farms, a campground along the river, and several historic farmhouses. Most of the quarry property itself consists of undisturbed woodlands. Testimony established the presence of a horseback riding camp in the meadows adjacent to the proposed project site, and the use of the adjoining road for riding and bicycling, including commercial bicycle tours. Several small commercial establishments are scattered along the river valley, including a repair shop and a dairy supply store. Although, as noted, industrial uses are not categorically excluded from the area, there is no

smokestack industry, and the only "manufacturing" business consists of a small building containing a fifty-year-old machine shop.

¶ 32. The court concluded that the asphalt plant would not adversely affect the character of the area based on evidence that, as proposed, the plant would operate "within the hours, truck limits, and noise limits of the existing quarry, gravel pit and rock crushing operation" and that there was sufficient "drainage control, odor control, dust control, landscaping and screening" to minimize adverse environmental impacts. In particular, the court found that the decibel level of noise produced by the operation of the plant would be no greater than that allowed under the quarry's existing Act 250 permit, whether or not the plant was operating concurrently with the rock crushing operation or independently.

¶ 33. We cannot conclude that the Environmental Court conducted a complete analysis in applying the conditional use standards, particularly with respect to cumulative impacts. By looking primarily at the zoning and Act 250 permit limits imposed on the existing operation, the court failed to find what differential impact would actually occur as a result of the asphalt plant. For example, with respect to noise, the court found that the plant would not cause the overall operation to emit noise in excess of the decibel limits in the preexisting permits, but did not evaluate the neighbors' complaint that the frequency of loud noise would increase and affect the use and enjoyment of nearby residences. Similarly, while the overall operation would remain within truck traffic limits, the court did not evaluate what increase in truck traffic would occur as a result of the presence of the asphalt plant and whether the additional traffic would produce an adverse effect. See 24 V.S.A. § 4407(2)(C). The failure to look at differential impact of industrial uses in a zone intended primarily for residential and commercial

uses creates the risk that the character of the neighborhood will incrementally shift so that the industrial uses dominate. See *Howard v. Canyon County Bd. of Comm'rs*, 915 P.2d 709, 711 (Idaho 1996) (upholding rejection of conditional use application for a third residential subdivision in an area with a "pervasively agricultural character," stating that "whether to grant a conditional use permit is fact specific. One or two residential areas in an agricultural zone may have only a de minimis effect, but a third development may cumulatively affect the overall character of the area."). The judgment of the Environmental Court must therefore be reversed, and the matter remanded to require the court to address the issue of the cumulative impact of the added noise and any other additional adverse environmental consequences of the proposed plant.

*Docket No. 2002-102*

¶ 34. In April 1999, Russell applied for a separate zoning permit to install the proposed asphalt plant on the east side of Route 7B, in the Town's commercial-industrial zoning district. The zoning administrator approved the application but the ZBA reversed the decision, finding that the project violated the height limitations in the zoning ordinance. Russell then appealed to the Environmental Court which, following a hearing, issued a written decision, concluding — in conformity with the ZBA — that the proposal exceeded the ordinance's height limitation. This appeal followed.

¶ 35. "We will uphold the environmental court's construction of a zoning regulation unless the construction is clearly erroneous, arbitrary or capricious."[7] *In re Miserocchi*, 170 Vt. 320,

323, 749 A.2d 607, 610 (2000). We find no error under this standard. The provision in question requires that development within the commercial-industrial zone comply with the following standard: "Building height — a maximum of three stories or 35 feet whichever is less." The court found, and it is undisputed, that the proposed asphalt plant contains a number of elements in excess of thirty-five feet, including: a batch tower (consisting of a sizing screen, holding bins, weight scales, mixer, and discharge gate) approximately fifty-nine feet in height, to be enclosed within corrugated metal siding to limit noise, odors, and emissions and restrict access; a drag slat conveyor, approximately seventy-one feet in height, also to be enclosed in metal siding; an exhaust stack for emissions, approximately sixty feet in height; and three product load-out silos, approximately fifty-two and a half feet in height.

¶ 36. Despite the fact that several components of the plant plainly exceed thirty-five feet, Russell claimed at trial that the height limit was inapplicable because the tower, conveyor, exhaust stack, and silos were "structures" not "buildings." Buildings, Russell asserted, are designed for occupation (which the asphalt plant plainly was not) and typically contain elements such as windows and roofs, which the plant components also lack. The court rejected the argument, noting that the ordinance contained no such restrictive definition of "building" or concomitantly broad definition of "structure," and, in fact, used the terms interchangeably. See, e.g., Town of Clarendon Zoning Bylaws § 123 ("The following temporary permits may be issued by the Administrative Officer for a period not exceeding one year, for use as a temporary *building*, for construction

---

[7] Although Russell asserts that the usual deferential standard of review should not apply here because the court's construction of the ordinance "is tantamount to a new rule of law" and was "derived without a proper analysis of the [zoning] Regulations themselves," the argument is unpersuasive.

and conditioned upon agreement by the owner to remove the *structure* or use upon expiration of the permit.") (emphasis added).

¶ 37. The court noted as well that while "building" may in some cases signify a structure designed for occupancy, the term is often used in a broader sense to mean a structure enclosing a space or sheltering contents, and need not necessarily be designed for occupation or require roofs or windows. See, e.g., *County of Addison v. Blackmer*, 101 Vt. 384, 389-90, 143 A. 700, 702 (1928) (building "may include most any kind of structure" and is often the "equivalent" of a structure); Webster's, *supra*, at 207 (building defined broadly as any "structure that is built"). Whether an entirely unenclosed structure such as a telecommunications tower might qualify as a building was immaterial, the court observed, as it was undisputed that a number of the asphalt plant components were enclosed within metal panels, and thus functioned as buildings.

¶ 38. The court's construction was reasonable, and therefore may not be disturbed on appeal. *Miserocchi*, 170 Vt. at 323, 749 A.2d at 610. We note that the ordinance contains no definition of building or structure. See *In re Cumberland Farms, Inc.*, 151 Vt. 59, 62-63, 557 A.2d 486, 488-89 (1989). Although Russell cites other dictionary definitions and cases construing "building" more narrowly, the court reasonably concluded that the ordinance evinced no intent to adopt such a narrow definition, and indeed, appeared to treat the term as largely synonymous with structure. Moreover, while there are reasons to distinguish between buildings and structures in other contexts, there is no apparent reason to do so for a height limitation with respect to the kind of structure involved here.

¶ 39. Russell also relies on the use of the term "stories" in the provision ("three stories or 35 feet, whichever is less"), but the reference may reasonably be construed as incorporating an alternative measure of height for those buildings with horizontal divisions, rather than a limitation. Finally, Russell asserts that the zoning administrator's issuance of several prior permits for structures in excess of thirty-five feet in the commercial-industrial district established a consistent interpretation of the ordinance contrary to the court's. See *In re Duncan*, 155 Vt. 402, 408, 584 A.2d 1140, 1144 (1990) (we will sustain interpretation of ordinance by administrative body responsible for its execution). As the court noted, however, none of the earlier permits were considered by the ZBA or a court, and therefore offer uncertain guidance as to the Town's construction. Here, in contrast, the ZBA expressly found that the height limit applied. Accordingly, we find no basis to disturb the judgment.

*In Docket No. 1999-418, the judgment is reversed. In Docket No. 2002-019, the judgment is reversed and remanded. In Docket No. 2002-102, the judgment is affirmed.*

Note: Justice Morse sat at oral argument but did not participate in this decision.