STATE OF VERMONT

ENVIRONMENTAL COURT

}
In re: Cetrangolo and DeFelice }
    Act 250 Permit Application }     Docket No. 66-3-06 Vtec
    (Self-Storage Facility - Northfield) }
}

Decision and Order on Appellant-Applicants' Motion for Summary Judgment

Appellant-Applicants D. L. Cetrangolo and David DeFelice (Applicants) appealed from a decision of the District 5 Environmental Commission denying their application for an Act 250 permit to construct the first phase of a self-storage facility on their property on Route 12 in Northfield. Applicants are represented by James P. W. Goss, Esq.; the Northfield Planning Commission is represented by Joseph S. McLean, Esq.; The Gray Building Coalition represents itself through its board member Kerri Hoffman, who is not an attorney. Intervenor Vermont Natural Resources Board has not filed memoranda on the present motions; it is represented by John H. Hasen, Esq. Applicants have moved for summary judgment. The following facts are undisputed unless otherwise noted.

Applicants' property is approximately 3.85 acres in size. It is located at 11 North Main Street (Vermont Route 12), in Northfield Village, in the Village Industrial zoning district. In October of 2004, Applicants applied for an Act 250 permit to install self-storage buildings on this property. The District Commission held a hearing in May 2005 on Applicants' application and issued a written decision denying it on February 28, 2006, on the sole basis that the project does not satisfy 10 V.S.A. 6086(a)(10), which requires conformance with the municipal plan. Applicants appealed this decision to Environmental Court.

1

The Town and the incorporated Village of Northfield have a unified zoning ordinance, within which the Town and the Village are divided into separate zoning districts. As described in §10.2 of the 2004 Town and Village of Northfield Municipal Plan (Municipal Plan), Northfield has four distinct "village centers," only one of which is the incorporated "Village of Northfield." The village centers described in the Municipal Plan are: "Northfield Falls," the most northerly of the four; "Northfield Village" proper, which includes the "downtown" area centered on Depot Square (its incorporated boundaries extend for approximately a mile north of Depot Square and include the project property); the "Center Village" surrounding the Norwich University campus farther south on Route 12, and the "South Village," centered on the intersection of Route 12 with the access road to Interstate 89.

Within the parts of the Town that are not in the incorporated Northfield Village[1] there are agricultural, recreation, conservation, residential, and industrial and commercial zoning districts, including an "urban residential" zoning district that is applicable to the three unincorporated village centers.[2] Within the incorporated Village of Northfield there are three residential zoning districts, a recreation zoning district, a "business" zoning district and an "industrial" zoning district. The boundaries of the districts are established as shown on an official zoning map in the municipal offices; no party has provided a copy of the zoning district map for the Court's use in the present motions.

---

[1] This decision will distinguish as necessary between the two groups of zoning districts by the prefix "Town" or "Village" before each zoning district. The maps provided by the parties in connection with these motions do not legibly show the exact dividing lines between the Town and the Village zoning districts. However, it is undisputed that as of the date of the District Commission proceedings, the project property was in the Village Industrial zoning district.

[2] While no map has been provided, the district is described as having that purpose in Table 10.2 of the Municipal Plan.

2

Route 12 (Main Street) runs in a north-south direction as it passes through the Village of Northfield, going over a bridge over the Dog River; the river (or[3] Depot Street) appears to divide "North" Main Street from "South" Main Street. Main Street is the principal north-south artery running through the Town. The Dog River flows in a south-to-north direction, and is located roughly parallel to and to the west of Main Street south of the project property, turns to the east under Main Street, forms the southerly boundary of the project property, and turns to the north, forming the easterly boundary of the project property as well, and continues to the north roughly parallel to and to the east of Main Street. The railroad line runs in a north-south direction through the area, one block to the west of Main Street.

To the south of and across the river from Applicants' property, along the east side of Main Street, and along East Street, are located various retail and personal service stores, including several cafés, a sandwich shop, a hair salon, a florist, a laundry and a plumbing company. The Town Hall, the library, and the post office are located farther south on the east side of Main Street.

To the south of and across the river from Applicants' property, diagonally across Main Street, is the Northfield Village core or downtown business area.[4] This area includes "Depot Square," an historic commercial district, which contains two nineteenth-century landmarks, the former Vermont Central Railroad station and the United Church, and an additional twelve historic structures. This downtown core business area includes

---

[3] The maps provided by the parties in connection with these motions do not show the exact dividing line.

[4] It does not appear to be disputed, and the Court can infer from the totality of the filings (including the District Commission decision), that the zoning district of this Village core or downtown business area in the vicinity of Depot Square is the Village Business zoning district, but the zoning district map has not been provided to the Court.

3

commercial and residential uses typical of a small Vermont town or village, including a drug store, a book store, a cable company, a restaurant, a café and a bank. The Municipal Plan characterizes Northfield Village as the "main hub of the community." Municipal Plan §10.2.

Directly across Route 12 from Applicants' property, apparently also in the Village Industrial zoning district, is a gas station with a convenience store, and a large hardware and feed store. To the north of the hardware and feed store, across Water Street, is a commercial dyeing business.

The Gray Building, a former school building, is located on a high knoll of land immediately to the north of and on the same side of Route 12 as the project property. A band of existing trees is located on the southerly boundary of the Gray Building property. The Gray Building is listed on the national historic register and has recently undergone extensive restoration to facilitate its adaptive reuse for a variety of business offices and community service uses. The restoration of the historic Gray Building and its adaptive reuse was specifically mentioned in Chapter 5 of the Municipal Plan, §5.3 at p. 37; §5.4 at p. 41, as well as in the 1997 Northfield Village Downtown Plan[5] (1997 Downtown Plan) as "Initiative #7."

Applicants' property formerly contained a granite processing plant and sales operation that was built in the early 1900s. The granite business ceased in 1997 and the plant was demolished at some point thereafter; some of the material has been used as fill

_____

[5] The Gray Building Coalition filed only a portion of this plan with its summary judgment response memorandum; it filed the cover page, the table of contents, Section One: Project Overview(containing numbered pages 1 and 2) and Section Two: Downtown Market Analysis (containing numbered pages 1 through 13), plus a page containing "Initiatives" numbered 4 through 8. This latter page contains the handwritten notation "pg 14" but is not in fact sequential to the other pages. Sections Three through Five of the plan (and its Appendix) were not provided by any party.

to level the site. The property contains a brick smokestack (located in the southerly portion of the property) and an existing cement wall along the river on the southerly property boundary, as well as four cement "piers," that are the remains of the granite processing plant. The smokestack and wall are proposed to remain in place in connection with the proposed project; the piers are shown on the plan as being incorporated into the 140-foot-long buildings that are a later phase of the project.

The property is relatively level and open as it extends from Route 12 easterly towards the bank above the level of the Dog River, with a band of trees and other vegetation along the river. Applicants propose an undisturbed 50-foot-wide vegetated buffer between the developed area of the site and the top of the river bank. Applicants propose to eliminate existing curb cuts and to install a single curb cut in the Main Street frontage for vehicle access to the site, as well as to install plantings and street trees at the sidewalk along Main Street to screen the site from view from the sidewalk and street.

Applicants' property is visible from the Gray Building, from Route 12, from the downtown business area across the river, and from residences along the Dog River, although the proposed buildings of Phase I would not be visible[6] from the downtown business area due to the proposed setback and screening.

Applicants propose to construct two[7] single-story, prefabricated metal self-storage

---

[6] As found by the District Commission in its analysis of the aesthetic effect of the proposed project, which was not appealed and so is the "law of the case." In re Bennington School, Inc., 176 Vt. 584, 587 n.2 (2004) (mem.); see also Village of Woodstock v. Bahramian, 160 Vt. 417, 424 (1993). Although the District Commission's decision has been provided, not all of the exhibits submitted to the District Commission have been provided, making it difficult for the Court to determine what other documents or exhibits might also reflect the "law of the case" regarding this project.

[7] These two buildings, shown as shaded in on the plan, are the first phase (Phase I) of Applicants' plan to eventually construct a total of seven self-storage buildings on their

buildings on their property.  The buildings are each proposed to be 120[8] feet in length; one is twenty feet in width and the other is thirty feet in width, making a total footprint of 6,000 square feet, containing a total of sixty[9] storage units.  The two proposed buildings comprising Phase I are set back approximately 100 feet from the Main Street sidewalk.

Applicants applied in August of 2004 (see Exhibit 8) for a municipal "building permit," shown on the application as "Phase I, 6000 sq [ft]," which was entered under "total sq[uare] f[ee]t" in place of the number 30,400, which was crossed out.  The project was referred to the Zoning Board of Adjustment (ZBA) for a hearing as a conditional use under §705 of the Zoning Regulations.  Applicants' application to the ZBA stated the "[p]rovision of zoning ordinance in question" in full as "SECTION 705: #6. RETAIL/PERSONAL SERVICE," leaving out the word "stores" which is the final term in that use category.  The ZBA appears to have granted the conditional use approval at its October 28, 2004 hearing.  Neither the minutes of that hearing nor any decision of the ZBA has been provided to the

property.  The five other buildings are proposed to be set back only approximately twenty feet from the sidewalk; they include one building that is 20' x 140' in size, one that is 30' x 140' in size, one that is 20' x 180' in size and two that are 30' x 180' in size.  Applicants now argue that the scope of the present appeal encompasses the entire seven-building project. However, Applicants applied to the District Commission only for Phase I, the first two buildings of the project, and the District Commission decision was limited to the first two buildings.  The appeal to this Court is de novo, but the scope of the appeal is limited to what was before the District Commission for its decision, that is, only the two buildings shaded by diagonal lines on the plan.

[8] While the introductory paragraph in the District Commission decision describes the buildings as 180 feet in length, the two buildings that are shaded on the plan and are shown as "Phase I" on the plan are 120 feet in length.  A 120-foot length results in the 6,000-square-foot footprint as stated on the project's municipal building permit application.

[9] The District Commission's findings analyzed the traffic generated by the buildings on the basis that they contained a total of sixty units, which would make each unit forty feet wide.

6

Court in connection with the present motions. The section of the "building permit" application showing referral to or the result of Planning Commission action is blank, as is the section for Zoning Administrator action.

Act 250 requires that an applicant demonstrate that a proposed project "[i]s in conformance with any duly adopted local or regional plan . . . under chapter 117 of Title 24." 10 V.S.A. §6086(a)(10). The burden of proof under this criterion is on the applicant. 10 V.S.A. §6088(a). In determining whether this criterion has been satisfied, if the district commission (or this Court on appeal[10]) finds the applicable provisions of the municipal plan to be ambiguous, "for interpretive purposes" the statute directs the Court to "consider [municipal] bylaws, but only to the extent that they implement and are consistent with those [plan] provisions, and [it] need not consider any other evidence." Id. This sentence of the statute was added in 2001 in response to the Supreme Court's decision in In re Kisiel, 172 Vt. 124, 130 (2000). In re John A. Russell Corp., 2003 VT 93, ¶20 n. 4, 176 Vt. 520, 524 n. 4 (2003) (mem.).

Several "key principles" guide the determination of whether a project complies with a local plan. John A. Russell Corp., 2003 VT 93, at ¶16–24, 176 Vt. at 523–25. First, a determination of nonconformity must be based upon a "'specific policy' set forth in the plan." Id. (quoting In re Green Peak Estates, 154 Vt. 363, 369 (1990)). The specific policy must be stated "in language that 'is clear and unqualified, and creates no ambiguity.'" John A. Russell Corp., 2003 VT 93 at ¶16, 176 Vt. at 523 (quoting In re MBL Assocs., 166 Vt. 606, 607 (1997) (mem.)). While "broad policy statements phrased as 'nonregulatory abstractions'" may not be given "'the legal force of zoning laws,'" John A. Russell Corp., 2003 VT 93 at ¶16, 176 Vt. at 523 (quoting In re Molgano, 163 Vt. 25, 31 (1994)), zoning

---

[10]  10 V.S.A. §8504(h).

bylaws are "designed to implement the town plan,[11] and may provide meaning where the plan is ambiguous." Kisiel, 172 Vt. at 130 (2000); 10 V.S.A. §6086(a)(10).

These key principles illuminate the two inquiries the Court[12] must make in evaluating whether a project conforms to a municipal plan, as laid out in In re John J. Flynn Estate and Keystone Dev. Corp., #4C0790-2-EB, Findings of Fact, Concl. of Law, and Order, at 27–28 (Vt. Envtl. Bd., May 4, 2004). The first part of the inquiry is whether the language in the local plan is mandatory, as opposed to merely providing "guidance." Id. The second question is whether the provisions are specific or, on the other hand, whether they are "general in nature or ambiguous." Id. at 28. A plan provision is considered to "evince[] a specific policy" if it "(a) pertains to the area or district in which the project is located; (b) is intended to guide or proscribe conduct or land use within [that area or district]; and (c) is sufficiently clear to guide the conduct of an average person, using common sense and understanding." Id.; In re Times and Seasons, LLC and Hubert K. Benoit, #3W0839-2-EB, Findings of Fact, Concl. of Law, and Order (Altered), at 59–60 (Vt. Envtl. Bd., Nov. 4, 2005).

In this inquiry, it is necessary to recognize that a municipal plan is meant to "provide a framework upon which the zoning regulations are built." John J. Flynn Estate, #4C0790-2-EB, Concl. of Law at 28. Municipal plans do not typically contain prohibitory language, id.; Times and Seasons, #3W0839-2-EB, Concl. of Law at 58, and, as the Environmental Board recognized in John J. Flynn Estate, #4C0790-2-EB, Concl. of Law at

---

[11] It is well-established in municipal zoning jurisprudence that the zoning "regulations control the plan." John A. Russell Corp., 2003 VT 93 at ¶16, 176 Vt. at 523 (quoting Smith v. Winhall Planning Comm., 140 Vt. 178, 183 (1981)); see Kalakowski v. John A. Russell Corp., 137 Vt. 219, 225 (1979).

[12] This Court is directed by 10 V.S.A. §8504(m) to give prior decisions of the former Environmental Board "the same weight and consideration" as it gives its own prior decisions.

27, the Court is obligated by the statutory language of 10 V.S.A. 6086(a)(10) itself, "to give regulatory effect to a document [the municipal plan] which, because its purpose is otherwise, is often not written in regulatory language."

Thus, while recognizing that "should" is not the equivalent of "shall" and "encouraged" is not the equivalent of "required," the Environmental Board in Times and Seasons concluded that the following plan provision was sufficiently mandatory, despite the qualifying language: "Where feasible, commercial development shall be located within or close to South Royalton Village or Royalton Village, re-using existing sites where possible, or in other locations specifically recommended in this plan and its amendments." #3W0839-2-EB, Concl. of Law at 59 (emphasis added). Further, in Southwestern Vermont Health Care Corp., the Environmental Board determined that the plan's statement[13] of "general policy" that high quality agricultural land "shall be protected," as further described in "Section 6 of this Plan" was sufficiently mandatory, even though all the relevant provisions in Section 6 of the plan were written in terms of "should encourage" or that certain "development designs . . . will be encouraged." #8B0537-EB, Findings of Fact, Concl. of Law, and Order, at 22, 23, 53 (Vt. Envtl. Bd., Feb. 22, 2001).

The 2004 Northfield Town and Village Municipal Plan(Municipal Plan) specifically recognizes the Act 250 criterion that a project applicant must show that the project is "in conformance with" the duly-adopted local plan. 10 V.S.A. § 6086(a)(10). Section 11.7 of the Municipal Plan provides specific language to assist in implementing this provision of Act 250 within the Town and Village of Northfield. The Municipal Plan states that, "[i]n the case of Northfield, conformance [of a project with the Municipal Plan under Criterion 10 of Act 250] should be determined by whether the proposed development is consistent

---

[13] The statement in the plan was as follows, §5.3.3.2(d)(4): "High quality agricultural land . . . shall be protected. (Refer to Section 6 of this Plan)."

with the specific policies listed at the ends of Chapters 2 through 10. If a project is not consistent with a specific policy, it should be determined to be not in conformance with the Plan." Chapters 2 through 10 contain a section at the end of each chapter detailing goals, policies, and tasks related to the subject matter of that specific chapter. The goal or goals for each chapter provide the context for understanding the specific policies of each chapter.

The District Commission denied the project under Act 250 Criterion 10, 10 V.S.A. § 6086(a)(10), due to its failure to conform with three specific chapters of the Municipal Plan. The District Commission did not deny the project on the basis of an adverse effect on aesthetics or historic sites under Criterion 8. No party appealed the decision as to Criterion 8 or as to any of the other chapters of the Municipal Plan, so that the proposal's compliance with Criterion 8 or the other chapters of the Municipal Plan is not at issue in this appeal.

In the present motion, Applicants move for summary judgment that the proposal conforms with all three of the chapters cited by the District Commission: those related to natural and cultural resources (Chapter 2), the local economy (Chapter 5), and land use (Chapter 10), and therefore that it meets Act 250 Criterion 10, 10 V.S.A. § 6086(a)(10) and should be approved by the Court.


Chapter 2 - Natural and Cultural Resources

Chapter 2 of the Municipal Plan is entitled "Natural and Cultural Resources," and addresses Northfield's "sense of place" as defined by its natural setting and its built environment; the latter is the aspect of Chapter 2 related to the proposed project. Section 2.1 of Chapter 2 recognizes that "Northfield does not have to go the way of many communities that are losing their sense of identity and place to nondescript, homogenous forms of development" and states that "[s]uch development . . . is inconsistent with the historic character of the built environment." Section 2.1 provides that "it is critical to protect environmental quality and community identity, and to preserve that which makes

10

Northfield a special place to live, work and visit." Municipal Plan, § 2.1. These statements provide the context for the Court's consideration of the policies in Chapter 2.

With respect to Northfield's cultural resources, the goal stated in § 2.5 for Chapter 2 is: "[t]o identify, protect and preserve important . . . historic features of Northfield's landscape, which help define the community's unique identity and sense of place; . . ." Municipal Plan, § 2.5. In pursuit of that goal, the plan states eleven policies (in the portion of § 2.5 to which the Court is directed by §11.7 for Act 250 analysis).

Of those policies,[14] which begin with the phrase "development should be . . . ," Policy 9 states that development should be "[s]ited and designed to be consistent with Northfield's historic settlement pattern, including traditional densities and scales of development, local street networks, and streetscapes;" and Policy 10 states that it should be "[c]ompatible with Northfield's historic architectural styles, . . ." With regard to the issue of specificity, and applying the analysis in John J. Flynn Estate, #4C0790-2-EB, Concl. of Law at 27, policies 9 and 10 do pertain to the Northfield Village area in which the project is located; they are intended to guide conduct or land use consistent with the historic character of the Village District; and they are sufficiently clear to guide an average person's conduct, using common sense and understanding.

On the other hand, the language of all the policy statements in Chapter 2 begins with "should" and therefore is not mandatory, yet §11.7 of the Plan itself calls for the Act 250 analysis to be made on the basis of conformance with these policy statements. The Court must therefore examine the zoning regulations to resolve this ambiguity and determine whether to interpret the policy statements in Chapter 2 to be any more mandatory than the "should be" language would deem to warrant. The Zoning Regulations, however, lack any

_____

[14] As the District Commission decision was not appealed on Criterion 8, we do not address Policy 11 regarding whether the project was designed to minimize adverse impacts to Northfield's historic sites and structures.

design review mechanism or any specific mandatory regulations as to the appearance of projects in the Village zoning districts, and lack any specific mandatory regulations pertaining to downtown development. Accordingly, Policies 9 and 10 in Chapter 2 are not sufficiently mandatory to form the basis for denial of the proposal under Criterion 10 of Act 250, and summary judgment must be GRANTED to Appellant-Applicants that the project does not fail to comply with Chapter 2 of the Municipal Plan.

Moreover, material facts have not been provided to the Court, other than in the text of the Municipal Plan itself, as to the traditional density and scale of development in the downtown core area, or the compatibility (or even the visibility) of the proposed project with respect to Northfield's historic architectural styles. Therefore, even if the plan were sufficiently mandatory as to Policies 9 and 10 of Chapter 2, the Court would have to deny summary judgment on the basis that material facts are in dispute, or at least have not been provided, with respect to whether or not the project as proposed complies with Policies 9 and 10 of Chapter 2 of the Municipal Plan.


Chapter 5 - Local Economy

The goal of Chapter 5 of the Municipal Plan, entitled "Local Economy," is: "[a] strong local economy characterized by well[-]paying jobs for area residents, a vibrant downtown, business opportunities for local entrepreneurs, and a broad tax base." Municipal Plan, § 5.4. In pursuit of that goal, the plan states eleven policies (in the portion of the chapter to which the Court is directed by §11.7 for Act 250 analysis).

Policy 3 is to "support reinvestment and revitalization of downtown properties to enhance the economic vitality of the downtown as the community's civic, cultural and commercial center," and, "to this end," Policy 3 states that "the implementation of the Northfield Village Downtown Plan is strongly encouraged."

Policy 1 is to "encourage strongly" the establishment or expansion of businesses

that, among other things, "reinforce the community's historic settlement pattern."

In Section 5.3, "Economic Outlook", under the heading of "Downtown Vitality", the Municipal Plan states that the 1997 Downtown Plan "set forth a conceptual master plan that included several initiatives for improving the vitality and the economic climate in the downtown." Unfortunately, the parties have not provided Section 3 of the 1997 Downtown Plan containing the conceptual master plan. However, as restated at § 5.3 of the Municipal Plan, one of these initiatives was "[r]edevelopment of the Cetrangolo parcel, which is well situated to serve as a cornerstone for downtown development efforts." Municipal Plan § 5.3 at p. 37. The 1997 Downtown Plan stated that "several possible uses for this parcel exist," and noted that "downtown lodging facilities have been identified as [a] priority by some local officials and business leaders." Municipal Plan § 5.3.

Applicants argue that this Court cannot consider this language because the 1997 Downtown Plan is not a "duly-adopted" plan pursuant to chapter 117 of Title 24. 10 V.S.A. §6086(a)(10). Applicants are correct that the Court, in assessing compliance with Criterion 10, does not analyze the project's conformance with the 1997 Downtown Plan directly. However, to the extent that the duly-adopted Municipal Plan incorporates the 1997 Downtown Plan by reference, language from the 1997 Downtown Plan may be considered by the Court as if it were stated outright in the Municipal Plan itself.

The project property is specifically mentioned in several places in the portion of the 1997 Downtown Plan provided to the Court. In the Introduction on page 1 of Section Two, summarizing the market analysis, the 1997 Downtown Plan states: "In particular, growth at Norwich University and the loss [of] a major downtown land use (Ce[]trang[o]lo) will have an [e]ffect on the downtown market." In the Executive Summary on page 3 of Section Two, identifying major events affecting the downtown's market position, the 1997 Downtown Plan states: "Ce[]trangolo's exit from the downtown will remove employees and spending from the area – however, it also opens up opportunities for redevelopment.

13

In the Executive Summary on page 4 of Section Two, and repeated as a "key conclusion" on page 13 of Section Two, the 1997 Downtown Plan states: "The Ce[]trangolo building may offer up an opportunity to create a collaborative craft/industrial shop. This, in turn, may have appeal to tourism and transient visitors." In the discussion in the text (on page 12 of Section Two) of the "opportunities for development" caused by "Ce[]trangolo's exit from the downtown," the 1997 Downtown Plan states: "The exit of a major employer from the downtown is certain to result in some loss of business for existing shops and services[; n]evertheless, this is an important downtown location, which should be viewed creatively as an opportunity for new uses."

The Municipal Plan is sufficiently mandatory and specific to determine that, for a project this near the core downtown area to conform to Chapter 5 of the Municipal Plan, it must contribute to the economic vitality of the downtown, whether by adding jobs or by adding downtown amenities that would provide reasons for residents (including Norwich students and faculty), residents of the region, and tourists, to make more use of the downtown area, that is, to contribute to "a vibrant downtown," especially in the evening. The Municipal Plan is not sufficiently mandatory or specific to require any particular type of development on the project property, as long as it complies with the applicable zoning regulations.

However, undisputed material facts have not been provided to the Court regarding whether the proposed two self-storage buildings would contribute to the economic vitality[15] of the downtown area of Northfield Village. All that appears in the materials provided by the parties are the statements in Applicant's Act 250 permit application that the project "involves no creation of jobs" (§6(a)); that it involves "no additional

---

[15] As contrasted with the cultural or community vitality of the downtown area which is addressed in Chapter 10 of the Municipal Plan.

14

employment" (§9A(b)); and that "traffic will be minimal relative to previous use as a granite plant with more than 60 employees . . . plus customers and vendors" (§5(I)). That is, the Court on summary judgment cannot make assumptions about the economic impact of a self-storage project on the economic vitality of the downtown area. Summary judgment is therefore DENIED as to whether or not the project as proposed complies with Chapter 5 of the Municipal Plan, as material facts are in dispute, or at least have not been provided to the Court in connection with the present motions, as to the issue of proposed project's effect on the local economy.

Chapter 10 - Land Use

Chapter 10 of the Municipal Plan states that one of the principal purposes of the plan is to provide a "foundation" for the Town's zoning regulations. Municipal Plan § 10.1. Section 10.2 describes the historic settlement patterns within the town, including each of the four village centers; it describes Northfield Village itself as "the main hub of the community," and that the village, "centered around Depot Square, functions as the community's downtown." Municipal Plan § 10.2.

Section 10.3 of the Municipal Plan describes the current land use (zoning) regulations of the Town and Village, dividing them in Table 10.2 into "urban" and "rural" districts. The eight land use (zoning) districts listed[16] in the Plan's Table 10-2 correspond

_____

[16] The Court's copy of the Land Use Districts Map attached to the Municipal Plan as A-7 is insufficiently legible for the Court to determine the location of any of the districts listed on it, and the Court has not been provided with a copy of the Official Zoning Map. There is sufficient ambiguity in the map to turn to the zoning regulation to understand Table 10.2 and Chapter 10 of the Municipal Plan. Nevertheless, the text of §10.3 of the Municipal Plan sufficiently defines that the so-called "urban core" discussed in Chapter 10 comprises the area "along the Dog River/Route 12 corridor from the Berlin boundary" in the north, through Northfield Village, "south to the area surrounding [the] intersections of Route 12 and Route 12A, and Route 12 and Route 64." This "urban core" includes all the

15

to the zoning districts contained in the Town and Village of Northfield Zoning Regulations; they are merely sorted differently, so that all the Village zoning districts plus the Town's "urban residential" district are listed as high density or "urban" districts, while all of the remaining Town districts are listed as lower density or "rural" districts.

With respect to Northfield's land use, the goal stated in § 10.5 for Chapter 10 is: "[t]o maintain the Town and Village's historic settlement pattern while managing development in a manner to further the other goals and policies of this Plan." Municipal Plan §10.5. In pursuit of that goal, the plan states twelve policies (in the portion of the chapter to which the Court is directed by §11.7 for Act 250 analysis).

Policy 5 of Chapter 10 provides that "the downtown area's central commercial, civic, and cultural community function will be reinforced through a concentrated mix of land uses at high densities and an urban pattern of development;" this must be read together with Policy 3 that "Northfield Village's role as the cultural, civic, and industrial center for the community should continue to be supported." Municipal Plan §10.5 (emphasis added). Policy 4 provides that development in traditional village settings "should be designed to reflect the traditional, pedestrian-scale of development . . . ." Municipal Plan §10.5.

Policy 1 of Chapter 10 provides that development "will be encouraged to locate within the urban core" land use districts "through [the] land use [zoning] regulations" as well as through the "related policies of" the Municipal Plan. Municipal Plan § 10.5 (emphasis added). Because this policy of Chapter 10 requires the zoning regulations to accomplish the goal of encouraging development to locate in the urban core, the Court must examine the zoning regulations regardless of whether or not the regulations would

_____

Village zoning districts plus the Town's "urban residential" zoning district.

16

have to be examined under 10 V.S.A. §6086(a)(10) due to the ambiguity of the provisions of Chapter 10 of the Municipal Plan discussed in footnote 16.

Policies 1 and 5 are clearly mandatory, and all of the cited policies pertain to the Northfield Village area in which the project is located, are intended to guide conduct or land use consistent with the character of the Village District, and are sufficiently clear to guide an average person's conduct, using common sense and understanding.

The Zoning Regulations as incorporated in Policy 1 of Chapter 10 of the Municipal Plan are mandatory and specific. Within the Village, no permitted uses are provided for the Village Industrial zoning district, Zoning Regulations, §705; that is, all proposed uses in the Village Industrial zoning district must obtain conditional use approval.[17] The only categories of conditional uses which are allowed by the zoning regulations to apply for conditional use approval in this district are: shopping centers (defined as two or more adjoining retail or service establishments having a common parking lot); manufacturing uses; motor vehicle sales; and "retail and personal service stores;" as well as utility rights-of-way and related structures; and government buildings. Zoning Regulations §705. While storage uses are allowed as conditional uses in the Town's "Industrial and Commercial" zoning district, id. §604, and the Town's Mill Hill Industrial/Commercial zoning district, id. §607, storage uses are not allowed in any of the Village zoning districts, or in the Town's

---

[17] To obtain conditional use approval, a proposal must demonstrate that it will not result in an adverse effect on "[t]he character of the area affected." Zoning Regulations, §208(2). The "character of the area," in turn, is "defined by the purpose or purposes of the zoning district within which the project is located and [by the] specifically stated policies and standards of the municipal plan." 24 V.S.A. §4414(3)(A)(ii).

Urban Residential district, that is, in any of the core urban area referenced in Chapter 10 of the Municipal Plan.  As the proposed self-storage facility does not fall within any of the conditional use categories allowed in the Village Industrial zoning district; it is therefore not an allowed use[18] in this zoning district for the purpose of determining its conformance with Policy 1 of Chapter 10 of the Municipal Plan: that is, it does not conform with that policy.

It also does not conform with Policy 4, in that it is a development in Northfield Village yet it does not reflect the traditional, pedestrian scale of development, as it is intended to be used only occasionally and only by people loading or unloading their storage units by vehicle.  Nor does it conform with Policy 5, as it does nothing to reinforce the downtown area's central commercial, cultural or civic community functions, in that it is not a use that draws people to the downtown area for any commercial or cultural purposes, in contrast with uses such as retail or service establishments allowed in the district.

Therefore, the proposed use does not conform with Chapter 10 of the Municipal Plan. Summary judgment is entered against Applicants and in favor of the Planning

[18] The Court recognizes that the Phase I two-building proposal received conditional use approval from the ZBA under §705 of the Zoning Regulations, as reflected in the "Board of Adjustment" section on the building permit application. (Applicants' Exhibit 8). However, there is no indication that Applicants have applied for or received site plan approval, which is a prerequisite to the issuance of a zoning permit for all uses other than one- or two-family residential uses, accessory buildings, and agricultural uses.  Zoning Regulations, §209; see In re Appeal of Jolley Associates, 2006 VT 132, ¶5 (vested right to conditional use review under old bylaws, but later site plan application to be reviewed under amended bylaws).  As the space on the building permit application for "Action of Zoning Administrator" is blank, nothing in the materials supplied to the Court reflects whether the project ever received a zoning permit from the Zoning Administrator.

Commission on this issue.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that Appellant-Applicants' Motion for Summary Judgment is DENIED, and summary judgment is GRANTED in favor of the Northfield Planning Commission that the project as proposed fails to comply with the Municipal Plan, at least with respect to Chapter 10 regarding land use, upholding the District Commission decision and concluding this appeal. Appellant-Applicants' Motion for Summary Judgment is GRANTED that the project as proposed does not fail to comply with Chapter 2 of the Municipal Plan, as Policies 9 and 10 of Chapter 2 are not sufficiently mandatory.

A telephone conference has been scheduled (see enclosed notice) to discuss whether Applicants wish to proceed in this appeal on the merits of Chapter 5, or whether the issues relating to Chapter 5 may be moot in light of the Court's decision with regard to Chapter 10.

Done at Berlin, Vermont, this 11th day of April, 2007.

_____
Merideth Wright
Environmental Judge