STATE OF VERMONT
SUPERIOR COURT, ENVIRONMENTAL DIVISION

|  |  |  |
|---|---|---|
| | } | |
| In re Pion Sand & Gravel Pit | } | Docket No. 245-12-09 Vtec |
| (Appeal from Act 250 Permit No. 7R1298) | } | |
| | } | |

## Decision on Motion for Party Status

James Murphy, Linda Murphy, Patrick Murphy, Penny Cargill, and Deborah Pratt ("Neighbors") have appealed a decision by the District 7 Environmental Commission ("District Commission"), which granted Bruce and Laurine Pion ("Applicants") Act 250 Land Use Permit No. 7R1298 to develop and operate a commercial sand and gravel pit on property located westerly of Vermont Route 100 in Lowell, Vermont. The District Commission made its final determination on party status requests after the close of its hearing; the Commission granted the Neighbors party status under Act 250 criterion 1, solely in relation to noise, and under criterion 8 with respect to scenic beauty and aesthetics. The Commission denied Neighbors' remaining party status requests. Pursuant to V.R.E.C.P. 5(d)(2), Neighbors have filed with their notice of appeal a motion for party status under Act 250 criteria 1, 3, 4, 5, 9B, 9E, 9K, and 10. Neighbors are represented by David Grayck, Esq.

Applicants, who oppose the pending party status motion, are represented by Jeremy D. Hoff, Esq. Both the Vermont Agency of Natural Resources ("ANR") and the Vermont Agency of Transportation ("VTrans") have entered appearances in these proceedings as Interested Parties, and they are represented by Judith L. Dillon, Esq. and Daniel D. Dutcher, respectively.[1] The Land Use Panel of the Vermont Natural Resources Board ("NRB") appears for informational purposes only through its attorney, Mark L. Lucas, Esq.

## Factual Background

For the sole purpose of putting the pending motion for party status into context, we recite the following facts, which we understand to be undisputed unless otherwise noted:[2]

---

[1] VTrans has filed a response to clarify certain factual issues, but it takes no position on the pending motion.

[2] We emphasize here that the Court is not yet at the stage of making specific factual findings, and our recitation is for the purpose of the pending motion only; it does not constitute factual findings. See Blake v. Nationwide Ins. Co., 2006 VT 48, ¶ 21, 180 Vt. 14 (explaining that factual findings are not required to dispose of pretrial motions).

1.      Applicants own a 52± acre property located to the west of Vermont Route 100 in Lowell, Vermont.  Applicants' property is comprised of two contiguous tracts of land: the northern tract is a 36.7-acre parcel (the so-called "Pudvah Lot") and the southern tract is a 15.56-acre parcel (the so-called "Part of Naramore Land").  Applicants propose to develop and operate a 4.4-acre commercial sand and gravel pit on the eastern side of the Pudvah Lot, near Route 100.

2.      Patrick Murphy, Penny Cargill, and Deborah Pratt are the current owners of a 17± acre developed lot located at 3972 Route 100 in Lowell.  Their parents, James and Linda Murphy,[3] claim to hold a life estate in this property.  However, Neighbors have not provided any deed or other recorded instrument evidencing that such a life estate exists.  The deed from James Murphy and his former wife to their children (the current owners of the property), does not contain any reference to a life estate being retained in the property.[4]

3.      Neighbors' property adjoins Applicants' property to the north; the southern boundary of Neighbors' property abuts the northern boundary of the Pudvah Lot, forming a 300-foot shared boundary line that runs perpendicular to Route 100.

4.      Neighbors' property is improved with a year-round camp-house and drilled well.  The two-bedroom camp-house, which is fully furnished and equipped with electricity, heat, insulation, and running water, is nestled among a stand of evergreens approximately 300 feet from the shared boundary.  The well is about 75 feet deep and approximately 250 feet from the shared boundary.  Neighbors claim that their well draws water from an aquifer that traverses underneath the 36.7-acre Pudvah parcel.  The precise location of the aquifer in relation to the 4.4-acre proposed pit, which is on the eastern side of Pudvah parcel, is not clear from the record thus far presented.

5.      Neighbors' property is accessed by a driveway that intersects Route 100 approximately 800 feet north of the common property line.

6.      Neighbors currently use their property for walking, hiking, hunting, sunning, having picnics, and using recreational vehicles.  Neighbors observe deer, bears, wild turkeys, and other wildlife on their property.

7.      A portion of Neighbors' property also has a twenty-year history of agricultural use.  In 2009, two acres were used for growing hay and ten acres were used for growing corn.  Aerial

---

[3]  Patrick Murphy, Penny Cargill, and Deborah Pratt are the natural children of James Murphy and his former wife, Myrna Hazard, and the step-children of Mr. Murphy's current wife, Linda Murphy.

[4]  We discuss the import of this life estate, or the lack thereof, on pages 19–20, below.

photos of the property indicate that Neighbors' agricultural use does not abut Applicants' lot; it occurs on the northern portion of Neighbors' property and is separated from Applicants' lot by the camp-house and evergreen stand.

8. On March 11, 2009, Applicants filed an Act 250 permit application with the District Commission, seeking approval for their proposed sand and gravel pit.

9. The pit would be operated from April until November and would have a maximum extraction rate of 15,000 cubic yards per year and a maximum operating life of twenty years. The total disturbed area of Applicants' sand and gravel operation would be 4.4 acres, including all attendant infrastructures. Estimated traffic from the project will include a maximum of forty-five one-way truck trips per day.

10. Applicants intend to operate the sand and gravel pit as a small, family-run business; Applicant Bruce Pion, who is licensed and trained by the federal Mine Safety and Health Administration, is expected to be the principal person engaged in all extraction activities.

11. The project would be sited on the eastern side of the Pudvah Lot, just south of the shared boundary. Neighbors contend that the pit would be within twenty-five to fifty feet of Neighbors' property, but this assertion does not appear to be supported by the record. The record, including the application and site plans, supports Applicants' representation that all extraction activities will take place at least 100 feet from the property line. Applicants explain that the only on-site disturbances occurring within 100 feet of the boundary would involve the installation of silt fencing and the placement of a topsoil berm, both of which are intended to mitigate any impact on Neighbors' property.

12. The project site is comprised primarily of a kame terrace, which is a glacial landform that was created when glacial meltwater deposited sand and gravel between the glacier and the valley wall. Many kame terrace formations in Vermont contain some traces of asbestos. However, there has been no evidence presented that the kame terrace on Applicants' property contains measurable traces of asbestos.

13. The proposed pit will be accessed by a newly developed road that intersects Route 100; it will generally follow a preexisting path on Applicants' property. Applicants worked with VTrans to design the proposed access road, and considered three alternatives before Applicants ultimately chose an access drive that intersects Route 100 relatively near the shared boundary

line.[5]  To increase northerly sight distances for vehicles leaving the project by way of the proposed access road, Applicants intend to cut back the bank and clear vegetation along Route 100 to create a 555-foot northerly sight-line.  The clearing and grading will occur on a narrow strip of State-owned land that lies between Route 100 and Neighbors' property.  The proposed work will parallel Neighbors' property line for approximately 300 feet and will come within twenty feet of their boundary.[6]

14.    In order to manage stormwater at the project site, Applicants have obtained a stormwater discharge permit from ANR, in addition to developing a Stormwater Pollution Prevention Plan ("SWPPP").  According to Applicants' SWPPP, the majority of stormwater runoff from the extraction area will be contained within the extraction pit; the bowl-shaped pit will create an infiltration area capable of storing 5,000 cubic feet of water.  Approximately fifty feet of sediment and soil will remain between the bottom of the pit and groundwater.[7]

15.    The District Commission held a hearing on the application on May 13, 2009, and on November 17, 2009, the District Commission issued Applicants Act 250 Permit No. 7R1298, which authorized the development and operation of the proposed sand and gravel pit.  In its written Findings, the District Commission granted Neighbors final party status under Act 250 criteria 1 (noise) and 8 (scenic beauty and aesthetics), but denied Neighbors final party status under all other requested criteria.

16.    Neighbors appealed the District Commission's decision to this Court on December 16, 2009.  With their notice of appeal, Neighbors filed a motion requesting that the Court grant them party status under Act 250 criteria 1 (dust, water pollution, asbestos, and pollution from hazardous materials), 3 (water supply), 4 (soil erosion), 5 (traffic), 9B (primary agricultural soils), 9E (extraction of earth resources), 9K (public investment), and 10 (town and regional plans).

---

[5] The record does not reveal the precise distance between the proposed access road and Neighbors' property line, but the site maps indicate that the distance is likely less than 200 feet.

[6] Because the record does not specify the distance between the proposed access road and Neighbors' property line, the extent of clearing and grading that will parallel Neighbors' property is unclear.  Nevertheless, assuming there is 200 feet between the access road and the common boundary line, approximately 300 feet of clearing will parallel Neighbors' property.

[7] We note that Applicants identified an isolated, perched aquifer within the project site; extraction operations will come within four feet of this aquifer.  No evidence indicates that the perched aquifer is connected to the groundwater table or Neighbors' water supply.

17.     Neighbors have submitted multiple affidavits in support of their party status requests, including an affidavit from Robert Ross, owner and principal hydrologist of Ross Environmental Associates.  Mr. Ross based his affidavit upon his review of Applicants' application materials.  Mr. Ross maintains that Applicants' proposal does not identify the depth of the water table beneath the proposed pit, the recharge area for Neighbors' aquifer, or how the excavation activities may affect groundwater flow and dynamics.  He concludes that this information is critical to understand the risk of contamination to Neighbors' water supply.

18.     Mr. Ross also maintains that, due to the geologic composition of Applicants' property, he expects to find asbestos on the site.  Mr. Ross has not taken any soil samples of the site to confirm his expectations.  Mr. Ross also avers that the predominant wind direction in the area would likely be to the north or south, which could blow dust, which he speculates may include asbestos, from the project site and onto Neighbors' property.  Mr. Ross acknowledges, however, that a site-specific wind study is necessary to determine the actual direction and velocity of wind in the area.

19.     Finally, Mr. Ross contends that the project's proximity has the potential to cause erosion that may encroach onto Neighbors' property.  He also asserts that excavation of the pit walls and the clearing of sight lines along Route 100 could lead to erosion that could destabilize Neighbors' property.

20.     Applicants counter this assertion with representations that their proposed extraction would be more horizontal than vertical in nature, since their on-site test pit investigations tend to show that the sand and gravel to be extracted is principally located in a raised area on the project site.  Consequently, much of the planned excavation will be digging into this area.  The pit is also to be located at least 100 feet back from the Neighbors' boundary line, and Applicants plan to install an earthen berm between the pit and Neighbors' property to provide a buffer from the project site.

21.     Applicants concede that the clearing along Route 100 will come within twenty feet of Neighbors' southeasterly boundary line.  However, Applicants represent that their sight clearing work has been reviewed and approved by VTrans officials.  Neighbors' expert witness's affidavit does not provide specific contradictions to these representations.

22.     Neighbors also submitted an affidavit from Benjamin Swanson, a Transportation Associate Level III traffic engineer with Resource Systems Group.  Mr. Swanson based his affidavit upon his review of the exhibits filed thus far in these proceedings, his personal

5

observation of the section of Route 100 fronting the two properties, and a speed-and-vehicle-classification study he performed, which measured operating speeds and the proportion of heavy-truck traffic on Route 100. Based on this information, Mr. Swanson asserts that Applicants' proposed access road to Route 100 creates an unreasonable traffic-safety risk because the planned 555-foot sight distance is inadequate to provide safe stopping distances for traffic traveling at the observed average speed (i.e., 59 MPH, along a portion of VT Route 100 posted at 50 MPH maximum). According to Mr. Swanson, a safe sight distance in this area for traffic traveling at an average speed of 59 MPH is between 825 and 995 feet.

23. Neighbors also submitted an affidavit from Edward C. D. Duncan, a Senior Associate with Resource Systems Group, which Mr. Duncan prepared after reviewing the exhibits filed in these proceedings. Mr. Duncan states that the sound pressure levels at the shared property boundary may reach 70 dBA, thereby exceeding background levels in the area by 40 dBA. He also notes that Applicants' proposal provides insufficient information with regard to the proposed equipment and topsoil stockpiles to determine their effect on mitigating the noise generated by the proposed project.

## Discussion

Neighbors have appealed the District Commission's decision granting Applicants an Act 250 permit to develop and operate a sand and gravel pit in Lowell, Vermont. Before proceeding to the merits of the appeal, however, Neighbors must first present sufficient evidence to support a conclusion that they are entitled to party status for each of the Act 250 criteria they wish to appeal. See 10 V.S.A. § 8504(a) ("[T]he person may only appeal those issues under the criteria with respect to which the person was granted party status."). The District Commission granted Neighbors party status under criterion 1 (noise) and criterion 8 (aesthetics and scenic beauty), but Neighbors now seek party status under additional Act 250 criteria: criteria 1 (dust, water pollution, asbestos, and pollution from hazardous materials), 3 (water supply), 4 (soil erosion), 5 (traffic), 7 (municipal services), 9B (primary agricultural soils), 9E (extraction of earth resources), 9K (public investment), and 10 (town and regional plan). The sole issue raised by the pending motion is whether Neighbors are entitled to party status for each of these Act 250 criteria.

In order to secure party status in these proceedings, Neighbors must demonstrate that they are an "adjoining property owner or other person who has a particularized interest protected by

6

[Act 250] that may be affected by an act or decision by a district commission." 10 V.S.A. § 6085(c)(1)(E). There are essentially two components to this provision. First, Neighbors must show that they have a specified interest protected by Act 250 that is particular to Neighbors, not a general policy concern shared with the general public. In re Champlain Marina, Inc. Dock Expansion, No. 28-2-09 Vtec, slip op. at 5–6 (July 31, 2009) (Durkin, J.). Second, Neighbors must demonstrate a causal connection between Applicants' proposed project and the potential impact to their particularized interests. In re Big Spruce Road Act 250 Subdivision, No. 95-5-09 Vtec, slip op. at 6 (Apr. 21, 2010) (Durkin, J.). In other words, Neighbors must establish a connection between the project and a particularized interest and that, due to a demonstrated connection, their specified interests may be adversely affected. Maple Tree Place Assocs., No. 4C0775-EB, Mem. of Decision & Order, at 6 (Vt. Envtl. Bd. Oct. 11, 1996), aff'd, No. 96-559 (Vt. Oct. 10, 1997) (unpublished mem.).

In making their presentation for party status, Neighbors need not demonstrate that a decision on Applicants' proposal will affect their particularized interests, or that they will prevail at a merits hearing; rather, they need only demonstrate that the project may affect their interests. We regard this as requiring Neighbors to provide an "offer of proof." In re Costco Act 250 Permit Amendment, No. 143-7-09 Vtec, slip op. at 1 (Dec. 4, 2009) (Durkin, J.) (entry order). As Applicants correctly note, this offer must be more than mere speculation and theory. An individual will not sufficiently demonstrate a causal connection with "unsupported assertions that vaguely defined interests" may be affected by a project. Re: Village of Ludlow, No. 2S0839-2-EB, Mem. of Decision, at 4 (Vt. Envtl. Bd. May 28, 2003) (quoting Maple Tree Place, No. 4C0775-EB, at 6). We have said before:

> [A]n offer of proof must be specific and concrete. It must indicate what further testimony or evidence will be introduced, to show what particular circumstances or conditions, and for what purpose it is offered. An offer must be sufficiently explicit to give the trial court an understanding of the materiality of the [to-be-] offered evidence. These standards are generally taken to require that witnesses' names and addresses be given, that acts or items be specifically described, and that the matter to be proved be carefully delineated.

In re RCC Atlantic, Inc., No. 163-7-08 Vtec, slip op. at 9 (Vt. Envtl. Ct. May 8, 2009) (Durkin, J.) (quoting R.E. Bean Constr. Co. v. Middlebury Assocs., 142 Vt. 1, 7 (1982) (citations omitted)). We apply these standards to Neighbors' pending request for party status.

7

Applicants ask us to apply these standards "in light of all of the testimony presented, and in light of all of the numerous conditions and mitigation requirements placed or imposed on the project by the terms of the permit." Applicants' Mem. in Op. at 6. Applicants argue that our examination of party status should show deference to the determinations already made by the District Commission, since it made final party status determinations at the close of its hearing and after having heard all the evidence presented. See 10 V.S.A. § 6085(c)(6) (explaining that the "district commission shall re-examine party status determinations before the close of hearings," which "shall supersede any preliminary determinations"). For the following reasons, we decline to proceed as Applicants request.

This is a de novo proceeding in which we review the application and supporting materials anew, as if no proceedings have taken place before the municipal panel or District Commission. In re Killington, Ltd., 159 Vt. 206, 214 (1992) (citing In re Green Peak Estates, 154 Vt. 363, 372 (1990)). We review a petition for party status "without reference to evidence or arguments presented to the [District] Commission." Re: McLean Enters. Corp., No. 2S1147-1-EB, Mem. of Decision, at 2 (Vt. Envtl. Bd. Sept. 30, 2003). Thus, we may only rely upon evidence and testimony submitted to this Court on appeal; testimony only presented during the proceedings below is immaterial to our de novo review. We furthermore do not consider in our review the conditions imposed by the District Commission because they are a consequence of the evidence and testimony presented below, and they represent the project as granted, not as proposed. It would be inappropriate for us to review the project's potential impacts in this light; such a review would contradict the purpose of a de novo proceeding.[8]

Having established the standards for review in the pending motion for party status, we turn to the criteria for which Neighbors request party status. Again, we first determine whether Neighbors have a particularized interest protected by each criterion. We must then examine whether Neighbors have set forth specific and concrete evidence of a causal connection between

---

[8] We have previously allowed an applicant to make some minor changes to its proposal, which are often made in response to neighbors' concerns or comments from officials, because it is a necessary part of the evolutionary process in permit proceedings. See e.g., In re Murphy Revocable Trust, No. 47-2-05 Vtec, slip op. at 7 (Vt. Envtl. Ct. Apr. 28, 2006) (Durkin, J.); see also In re Sisters & Bros. Inv. Group, 2009 VT 58, ¶¶ 19–21 (holding that an applicant's submission to the Environmental Court of a revised site plan does not necessitate a remand to the town). Sometimes, an applicant may incorporate into a revised application the conditions imposed in the proceedings below, when presenting their application on appeal. To date, however, we have not been made aware that Applicants here intend to modify their proposal to include the conditions imposed by the District Commission below. We therefore review anew the proposal as presented in the application materials provided to the Court.

Applicants' proposal and Neighbors' particularized interest such that Applicants' proposal may affect Neighbors' interests.

**Criterion 1 (dust and asbestos)**

Neighbors first request that they be granted party status under Act 250 criterion 1 with regard to dust and asbestos impacts upon their property that may be caused by the proposed project. Criterion 1 is intended to ensure that a proposed development "[w]ill not result in undue . . . air pollution." 10 V.S.A. § 6086(a)(1). Neighbors currently use their property for walking, hiking, hunting, sunning, having picnics, and using recreational vehicles, and they allow their land to be farmed by local farmers for a nominal charge. Neighbors argue that air pollution coming from Applicants' operation, namely dust and asbestos, may emanate from the exposed pit, travel through the air, and settle on their property, thereby interfering with their ability to enjoy outdoor recreation, farming, and family gatherings. If the airborne emissions include asbestos, Neighbors fear unsafe health conditions will result.

We first conclude that Neighbors' have a sufficiently particularized interest under criterion 1 with regard to dust and asbestos. Their property and camp-house is directly adjacent to Applicants' property, and the proposed pit and its support structures are somewhere between 25 and 100 feet from the shared boundary. Neighbors' interest in avoiding undue air pollution while recreating and farming is particular to the owners of the camp-house and not a general concern shared with the public. However, we also conclude that Neighbors have failed to provide a sufficiently specific and concrete offer of proof to demonstrate that their interests may be affected by the proposal in this regard.

Neighbors' expert Ross maintains that many geologic features in Vermont similar to the kame terrace on Applicants' property contain asbestos, and although he expects to find asbestos in area soil samples, he provides no specific evidence that asbestos is actually present on Applicants' site. The concern over asbestos is purely speculative because no sampling of the area has been done. Mr. Ross also opines that, despite Vermont's prevailing westerly winds, the predominant wind direction in the project area would likely be from the north or south, raising the likelihood that dust from the pit will settle on Neighbors' property. However, Mr. Ross does not offer evidence that dust will actually settle on Neighbors' property. In fact, he concedes that a site-specific wind study has not been conducted and, without this data or any sampling and analysis of the site, there is no way to assess the impact on Neighbors' property. It appears that

Mr. Ross's conclusions are based on speculation. This is an insufficient basis to support the granting of party status.

To secure party status under criterion 1, Neighbors must provide concrete evidence of a causal connection between the development and certain specified interests, and then demonstrate that because of that connection, the project may adversely affect Neighbors' interests. Neighbors' offer of proof lacks the requisite connection because they have not provided any evidence that dust or asbestos from the project that will actually radiate from the project site to their property. Accordingly, we conclude that Neighbors' offer of proof to substantiate their concerns over dust and asbestos are insufficient to support the granting of Neighbors' request for party status under Act 250 criterion 1 (dust and asbestos). We must therefore **DENY** their request.

### Criterion 1 (water pollution)

Neighbors also request party status under another sub-provision from criterion 1, which ensures that a proposed development "[w]ill not result in undue water . . . pollution." 10 V.S.A. § 6086(a)(1). Neighbors' drilled well is served by an aquifer that traverses below the Pudvah parcel, and they seek party status to protect the quality of their water supply. Neighbors contend that the use of heavy trucks, earth extraction equipment, and crushers, all of which contain fuel and oil, carry a risk of unintended leaks and spills that could reach the aquifer that serves Neighbors' camp-house.

Although we conclude that Neighbors interest under this criterion is sufficiently particularized, Neighbors have again not laid an adequate foundation for us to conclude that Applicants' proposal may impact these specific interests. Neighbors' expert (Mr. Ross) does not provide concrete evidence of a connection between the project and the underground aquifer. Rather, Mr. Ross contends that Applicants' proposal omits the information necessary to assess the potential impact on Neighbors' water quality. For example, Mr. Ross complains that Applicants do not identify the recharge area for the aquifer, the depth of the water table, or how the excavation activities may affect groundwater flow and dynamics. Mr. Ross then speculates that removing sand and gravel, which currently filters the water that may recharge the aquifer that possibly serves Neighbors' property, could eliminate an essential filtration function, thereby increasing the risk of contaminating the water supply. Mr. Ross specifies a claimed omission in the pending application materials, but then offers no factual or methodological support for his

10

conclusory statement that Applicants' proposed project will "eliminate" essential filtration soils. Identifying possible omissions in an Act 250 application does not automatically supply the requisite offer of proof for an individual seeking to secure party status in the permit proceedings.

Neighbors have offered no evidentiary foundation to suggest how contaminants would reach the aquifer; we do not have evidence of the distance (horizontal or vertical) between the excavation activities and the aquifer's recharge area. Mr. Ross has not conducted a groundwater or geologic survey to provide specific and concrete evidence of a causal connection between the proposal and interests protected by criteria 1. Mr. Ross merely theorizes that, because neither the aquifer-recharge area nor the groundwater table is indicated on Applicants' plans, there must be a risk that contamination of the aquifer could occur. These assumptions are purely theoretical and contradicted by some of Applicants' representations of how the pit will be constructed and operated, including that extraction activities will only disturb 4.4 of the 36.7 acres on the Pudvah parcel.

Accordingly, we conclude that Neighbors have not set forth a sufficient offer of proof that Applicants' proposed pit may affect interests protected by criteria 1 related to water pollution. See, e.g., Appeal of Rivers Development, LLC, Nos. 7-1-05 Vtec and 68-3-07 Vtec, slip op. at 5 (Vt. Envtl. Ct. July 3, 2007) (Durkin, J.) (denying party status "because concern that quarry well-drilling could affect [a neighbor's] well is too speculative; no offer of proof [concerning] groundwater flow"). We therefore **DENY** Neighbors party status under Act 250 criteria 1 (water pollution).

## Criterion 3 (water supply)

Neighbors also seek by their pending motion to receive party status under criterion 3, which ensures that a project "[w]ill not cause an unreasonable burden on an existing water supply, if one is to be utilized." 10 V.S.A. § 6086(a)(1), (3). According to Neighbors, the contamination about which their expert speculates has the potential to reach the underground aquifer, thereby diminishing the quality of Neighbors' water supply and thereby aversely affecting interests protected by criterion 3. Neighbors' reliance on criterion 3 to protect this interest is misplaced. Criterion 3 does not govern possible contamination of existing water supplies. Rather, criterion 3 is concerned with "impacts on the ability to meet demand of neighboring wells or water sources if those other wells or water sources share the same basic

11

source of water." Re: MBL Assocs., No. 4C0948-EB (Altered), Findings of Fact, Conclusions of Law, and Order, at 28 (Vt. Envtl. Bd. May 2, 1995).

In relation to Neighbors' professed concerns, we conclude that Applicants' proposal does not implicate criterion 3 for several reasons. First, Applicants' project does not propose to access a water source; we therefore must conclude that there will be no "unreasonable burden" on a water source to be utilized by the proposed project. Second, Neighbors do not claim that the proposed sand and gravel pit will burden their existing water supply by drawing from the same aquifer; rather, their basis for seeking party status under criterion 3 is their assertion that leaks and spills from trucks and other equipment may contaminate their water source. This concern is not within the scope of criterion 3, the concern of which is whether a proposed project "impacts on the ability to meet demand of neighboring wells or water sources." Re: Nile and Julie Duppstadt, No. 4C1013 (Corrected)-EB, Findings of Fact, Conclusions of Law, and Order at 2 (Vt. Envtl. Bd. Oct. 30, 1998) (quoting Re: MBL Assocs., No. 4C0948-EB (Altered), Findings of Fact, Conclusions of Law, and Order at 28 (Vt. Envtl. Bd. May 2, 1995)). Concerns about a project's impact upon water quality, as opposed to impacts on water supply quantity, are more appropriately raised under criterion 1(B). MBL Assocs., No. 4C0948-EB (Altered), Findings of Fact, Conclusions of Law, and Order, at 28.

Thus, we conclude that Neighbors have not alleged that an interest protected by criterion 3 may be affected by the proposal. We therefore **DENY** Neighbors party status under Act 250 criteria 3 (water supply).

## Criterion 4 (soil erosion)

Neighbors next request party status under criterion 4, which is designed to ensure that a proposed project "[w]ill not cause unreasonable soil erosion or reduction in the capacity of the land to hold water so that a dangerous or unhealthy condition may result." 10 V.S.A. § 6086(a)(4). Neighbors fear that the project will cause soil erosion on or near their property, which may result in dangerous or unhealthy conditions that interfere with the full use of their property. According to Neighbors' expert Ross, significant soil erosion of the pit walls could lead to bank failure and, by virtue of the pit's proximity to the shared boundary, unreasonably increase the risk of destabilizing Neighbors' property. Mr. Ross adds that there is potential for erosion to occur on Neighbors' property along Route 100 as the bank is cut and trees are removed to improve sight lines at the operation's access point. These concerns, which are not

12

solely shared with the general public, since the possible impacts could be direct to Neighbors' adjoining property, constitute a sufficiently particularized interest protected under criterion 4.

It is hard for us to imagine, without some specific evidence, how erosion of the pit walls could destabilize Neighbors' property, particularly when the site plan drawings indicate that the exposed pit walls will be separated from the boundary by at least 100 feet (which will also include a topsoil berm). However, we view the proposed bank cut and tree clearing along Route 100 to present sufficient evidence to grant Neighbors party status under criterion 4. Applicants' propose to cut back the bank and remove vegetation along Route 100 to improve vehicular sight lines. This excavation will occur on a narrow strip of land that parallels Neighbors' property for nearly 300 feet and comes within twenty feet of their boundary line, which evidences a causal connection between the proposal and a potential impact upon Neighbors' interests: a steeper slope and lack of vegetation on land in such close proximity to Neighbors' property may increase the potential for unreasonable erosion and dangerous or unhealthy conditions. We therefore **GRANT** Neighbors party status under criterion 4, but solely as to the proposed excavation work along Route 100.

## Criterion 5 (traffic) & Criterion 9(K) (public investments)

Neighbors next request party status under criterion 5, which protects against a proposal causing "unreasonable congestion or unsafe conditions with respect to use of the highways, waterways, railways, airports and airways, and other means of transportation existing or proposed." 10 V.S.A. § 6086(a)(5). Neighbors' driveway intersects Route 100 just north of the proposed pit access road, and they are genuinely concerned that Applicants' proposal will adversely affect safe access to Neighbors' property. In fact, a member of Neighbors' family was tragically killed in 1987 when a dump truck traveling south on Route 100 at a high rate of speed collided with his car as he exited their driveway.

Although the alignment of Route 100 has since been changed, Neighbors seek party status to ensure that increased truck traffic will not exacerbate existing adverse traffic conditions and cause unreasonable congestion or unsafe conditions on Route 100. They argue that Applicants' proposed access to Route 100 is unsafe and that forty-five additional one-way truck trips per day on Route 100 renders unsafe the intersection between their driveway and the road.

In light of this, Neighbors' interest in providing safe access to their property is sufficiently particularized. The interest is only shared by those who gain access to their property

13

via a driveway that intersects Route 100 in the vicinity of the pit. "[T]he mere fact Neighbors' particularized concerns may be shared by other members of the public does not cause a failure on Neighbors' part to demonstrate particularized injuries." In re Champlain Marina, Inc. Dock Expansion, No. 28-2-09 Vtec, slip op. at 4 (July 31, 2009) (Durkin, J.); see also Re: McLean Enters. Corp., No. 2S1147-1-EB, Mem. of Decision, at 8 (Vt. Envtl. Bd. Sept. 19, 2003) (explaining that it is irrelevant if other individuals may also be similarly impacted from a development as long as the impacts to the petitioners are particular to them, concrete, and not an impact only affecting the common rights of all persons). We therefore conclude that Neighbors have a particularized interest protected by criterion 5.

We also conclude that Neighbors have set forth an adequate offer of proof that the project may affect their particularized interest. In determining whether party status is appropriate, "the relevant inquiry is whether the petitioner uses the roads that may be impacted by a project on a regular basis." RE: Pike Industries, Inc., No. 5R1415-EB, Mem. of Decision, at 2 (Vt. Envtl. Bd. Nov. 19, 2004). Neighbors have demonstrated that they use Route 100 on a regular basis because it provides the sole access to their property, and they have established that the daily addition of forty-five one-way heavy truck trips on Route 100 may affect safe access to their property. Further, Neighbors' expert Swanson concluded, based on his speed-and-vehicle-classification study, that the proposed 555-foot sight distance planned for the project's access point to Route 100 may be an inadequate stopping distance for established vehicle speeds. These concrete and specific facts indicate that there is a connection between Applicants' proposal and Neighbors' interest in safe traffic conditions; they also demonstrate that the proposal may impact those interests. We therefore **GRANT** Neighbors party status under criterion 5.

Neighbors similarly request party status under criterion 9(K), which protects the public investment in governmental facilities adjacent to a proposed project, including state highways such as Route 100. Criterion 9(K) ensures that the proposed development "will not unnecessarily or unreasonably endanger the public or quasi-public investment . . . or materially jeopardize or interfere with the function, efficiency, or safety of, or the public's use or enjoyment" of the investment. 10 V.S.A. § 6086(a)(9)(K). Neighbors insist that Applicants' proposal materially jeopardizes the safety of Route 100.

For the same reasons we granted Neighbors party status under criterion 5, we conclude that Neighbors are entitled to party status under criterion 9(K). Neighbors have set forth an offer of proof that demonstrates a connection between Applicants' proposed pit and Neighbors'

14

interest in safe use of Route 100 and safe access to their property. Accordingly, we **GRANT** Neighbors party status under criterion 9(K).

**Criterion 9(B) (primary agricultural soils)**

Neighbors request party status under criterion 9(B) to ensure that Applicants' proposal will not interfere with the agricultural use of Neighbors' property, which local farmers have farmed for twenty years. They contend that air and water pollution from extraction operations may adversely affect the agricultural potential of Neighbors' property. However, for the reasons stated below, we conclude that Neighbors have not asserted an interest that is protected by criterion 9(B).

"Criterion 9(B) applies only if primary agricultural soils exist on the project site." In re Times & Seasons, LLC Act 250 Reconsideration, No. 45-3-09 Vtec, slip op. at 6 n.8 (Vt. Envtl. Ct. Mar. 29, 2010) (Durkin, J.); Re: Allen Brook Investments, LLC, No. 4C1110-EB, Findings of Fact, Conclusions of Law, and Order, at 8 (Vt. Envtl. Bd. Jan. 27, 2004); see also In re Village Assocs. Act 250 Land Use Permit, 2010 VT 42, ¶ 10 (noting that analysis under 9(B) is only triggered after a threshold determination that primary agricultural soils exist on a project site). Agricultural operations on adjoining parcels are protected only after it is determined that a proposed project will reduce the agricultural potential of primary agricultural soils on the project site. See In re Morgan Meadows/Black Dog Realty, No. 267-12-07 Vtec, slip op. at 8 (Vt. Envtl. Ct. Dec. 1, 2008) (Wright, J.) (explaining that criterion 9(B) protects agricultural operations on adjoining lands only if the threshold determination triggers the sub-criteria of 9(B)).

In this case, Neighbors make no allegation that the project site contains primary agricultural soils; they only maintain that presumed pollution emanating from the sand and gravel pit may weaken the agricultural potential of soils on their property. This interest is not protected by criterion 9(B) unless there is evidence that Applicants' project may reduce agricultural potential of primary agricultural soils on the project site. Without such an offer of proof, Neighbors interest does not fall within the ambit of those protected by criterion 9(B).

Even if we were to conclude that Neighbors had a particularized interest to protect under criterion 9(B), Neighbors have failed to demonstrate through a sufficient offer of proof that the project may affect their interest. Neighbors argue that the proposal's potential airborne emissions and water contamination may jeopardize the continued agricultural operation on Neighbors' property, but Neighbors have not set forth specific and concrete facts of a causal

15

connection between the proposed project and their interests. As we explained above, the potential impact from dust is entirely speculative; there is no indication that dust in any amount will actually emanate from the project and settle on Neighbors' agricultural lands. Further, Neighbors presented no evidence of a connection between Applicants' project and possible water contamination on Neighbors' property. Without concrete evidence of a connection to the proposal, there is no reason to conclude that Neighbors' interests may be affected. Accordingly, we **DENY** Neighbors party status under criterion 9(B).

**Criterion 9(E) (extraction of earth resources)**

Neighbors request party status under criterion 9(E) to enforce the two interests protected by that criterion. Criterion 9(E) first ensures that a resource-extraction project will not have "an unduly harmful impact upon the environment or surrounding land uses." 10 V.S.A. § 6086(a)(9)(E)(i). This part of criterion 9(E) prevents a quarry operation such as Applicants' from infringing upon the use and enjoyment of Neighbors' land by protecting a variety of interests; indeed, any effects demonstrated under the other Act 250 criteria (i.e., air, noise, or water pollution) may also be raised under criterion 9(E) if the project involves the extraction of earth resources. Re: Pike Industries, Inc., No. 5R1415-EB, Findings of Fact and Conclusions of Law, and Order, at 49 (Vt. Envtl. Bd. June 7, 2005). But criterion 9(E) goes further. It also requires the development of a site-rehabilitation plan to ensure that, after extraction operations are complete, the site is left in a condition that remains suitable for an approved alternative use. 10 V.S.A. § 6086(a)(9)(E)(ii). The reclamation plan must show that the site will be stable and unlikely to suffer adverse consequences once extraction activities are completed. In re Rivers Dev., Nos. 7-1-05 Vtec and 68-3-07 Vtec, slip op. at 65 (Vt. Envtl. Ct. Mar. 25, 2010) (Durkin, J.).

In requesting party status under criterion 9(E), Neighbors contend that the proposal's loud noise and disruptive land use may affect how Neighbors' hunt and enjoy wildlife on their property. Neighbors also contend that any reclamation plan will likely affect their ability to use and enjoy their land in the future. Based on the information in the record, we conclude that Neighbors have evidenced a sufficiently particularized interest in both aspects of criterion 9(E). Neighbors' interest in preserving the use and enjoyment of their property is particular to them as adjoining landowners; it is not a generalized grievance shared by the public. We also conclude, as explained below, that Neighbors have demonstrated a causal connection between the project

and both interests protected by criterion 9(E) such that we conclude that Neighbors' interests may be affected.

On the one hand, Neighbors have demonstrated that the resource-extraction project may interfere with their current land use. Not only is there a risk adverse impacts from increased traffic, but Neighbors' expert Duncan also concluded that the sound pressure levels at the shared property boundary may reach or even exceed 70 dBA. The increased noise caused by the project and heard on Neighbors' property may have an adverse impact on Neighbors' ability to hunt and observe wildlife or otherwise recreate on their property. See, e.g., Appeal of Rivers Dev., LLC, Nos. 7-1-05 Vtec and 68-3-07 Vtec, slip op. at 6 (Vt. Envtl. Ct. July 3, 2007) (Durkin, J.) (granting party status "because of potential impact on use/enjoyment of her property"). Further, the close proximity between the project and Neighbors' property provides a connection between the reclamation plan and Neighbors' future land use. Applicants' proposal involves disturbing 4.4 acres of land and placing topsoil berms as close as twenty-five feet from Neighbors' property line. Neighbors' future use and enjoyment of their land may be impacted unless a reclamation plan sufficiently returns the site to stability and otherwise averts long-term adverse consequences. We therefore **GRANT** Neighbors party status under criterion 9(E).

**Criterion 10 (town and regional plans)**

Finally, in order to ensure that Applicants' proposal complies with the Lowell Town Plan and Northeastern Vermont Regional Plan, Neighbors request party status under criterion 10, which requires Applicants' proposal to conform to a "duly adopted local or regional plan or capital program." 10 V.S.A. § 6086(a)(10). According to Neighbors, both of the existing Town and Regional Plans encourage open farmland, seek to protect agricultural and scenic areas, and promote compatible uses. Neighbors allege that their interests under the plans may be infringed by Applicants' proposal.

Every resident of the town has a particularized interest under criterion 10 to ensure that a project complies with their town plan. Re: John J. Flynn Estate, No. 4C0790-2-EB, Mem. of Decision, at 7 (Vt. Envtl. Bd. Oct. 8, 2003) ("[E]very citizen of a town where a project is proposed can claim a direct interest, distinct and different from the public in general, in the efficacy and viability of his or her town plan—an interest in seeing that such town plan is respected."). In this instance, however, Neighbors are not residents of Lowell; they merely have an interest in property within the Town (either a life estate interest or an ownership interest).

17

However, we need not decide today whether this is sufficient to demonstrate a particularized interest under criterion 10 because, even if Neighbors have a particularized interest, they have not identified any provisions in the Town Plan to which we can assess Applicants' compliance.

In their request for party status, Neighbors have identified five provisions in the Town Plan with which they contend Applicants' proposal conflicts. These provisions articulate goals such as (1) "Maintain the Town's beautiful character as much as possible"; (2) "Have . . . unsightly land uses screened"; (3) "Protect Lowell's . . . natural resources"; (4) "Encourage open farmland"; and (5) "Allow development along . . . Route 100 that compliments and does not distract from the scenic qualities." These abstract policy statements lack specific enforcement standards and therefore do not provide an adequate basis for assessing conflict. In re John A. Russell Corp., 2003 VT 93, ¶ 17, 176 Vt. 520 (mem.) (citations omitted). Even with these provisions in mind, we are unable to determine whether Applicants' proposal complies with the Town Plan.

In order to assess a proposal's compliance with a town plan, the plan must set forth a "specific policy" stated in language that "is clear and unqualified, and creates no ambiguity." Id. at ¶ 16 (citations omitted). "Broad policy statements phrased as 'nonregulatory abstractions'" are not legally enforceable provisions of a town plan. Id. (citing In re Molgano, 163 Vt. 25, 31 (1994)).[9] The rationale for these limitations when considering a project's conformance with a town or regional plan is rooted in the necessary understanding that land use regulations must provide sufficient notice to a property owner of the standards by which her land use proposal will be judged. Aspirational provisions expressed in broad, vague language provide no such notice to a property owner.

The provisions cited by Neighbors are unenforceable: they are aspirational purpose provisions that articulate guiding principles, but they are not regulatory provisions that explain what is or is not allowed. In re Meaker, 156 Vt. 182, 185 (1991) (explaining that purpose statements in municipal regulations generally have "no direct regulatory effect"). While Neighbors may have an interest in seeing that the Town Plan is respected, they have failed to identify any enforceable provisions in the Town Plan with which Applicants' proposed project is

---

[9] We recognize that zoning bylaws "are designed to implement the town plan, and may provide meaning where the plan is ambiguous" or otherwise "provides no specific standards to enforce the policy." In re John A. Russell Corp., 2003 VT 93, ¶¶ 16–17 (citations omitted). However, Neighbors have not filed the Town zoning bylaws from which enforceable standard may be discerned. Our analysis is therefore limited to the provisions provided.

in conflict, and thus have failed to demonstrate that Applicants' proposal may affect any interest protected by the Town Plan under Act 250 criterion 10.

With respect to the Regional Plan, Neighbors similarly do not lay an adequate foundation for us to assess Applicants' compliance with enforceable provisions. Neighbors explain that the Northeastern Vermont Regional Plan contains policies pertaining to compatible land uses, but Neighbors do not identify which provisions implement these policies. Neighbors have therefore neglected to highlight a specific potential basis for noncompliance, leaving us with no way to determine whether the interests protected by the Regional Plan may be affected by Applicants' proposal.

Accordingly, we conclude that Neighbors have not demonstrated how Applicants' proposal may affect any interest Neighbors have in seeing that the Town and Regional Plans are respected. They have failed to specify the potential grounds for conflict. We therefore **DENY** Neighbors party status under criterion 10.

## Ownership interests in neighboring property

Finally, we return to a preliminary issue that impacts upon the standing for some of the Neighbors, namely James and Linda Murphy. Their co-Appellants—Patrick Murphy, Penny Cargill, and Deborah Pratt—are the current fee title owners to the neighboring property. James and Linda Murphy assert that they hold a life estate in the neighboring property, but the source deed, presented by Applicants as Exhibit H, evidences no retained interest in the neighboring property when James Murphy conveyed the property to his children. Neighbors assert that James and Linda Murphy somehow now hold a life estate interest in this property and have acknowledged their representation in the form of an affidavit, but have failed to present any deed or other writing that could legally convey such an interest to James and Linda. Any conveyance of an interest in real estate must be in writing, signed by a person having authority to make such a conveyance. 27 V.S.A. § 301. Oral representations that purport to convey an interest in real estate merely create a tenancy at will, at best, and otherwise have no force or effect recognized by our laws. 27 V.S.A. § 302; see also Rutland County Nat'l Bank v. Swyer, 113 Vt. 485 (1944).

Without a lawfully recognized interest in the neighboring property, we cannot discern how James and Linda Murphy comply with the statutory provision that an "adjoining property owner or other person who has a particularized interest . . . that may be affected by" a district

commission decision on a proposed Act 250 application. 10 V.S.A. § 6085(c)(1)(E). James and Linda Murphy have not provided sufficient evidence to support a determination that they are part owners of the neighboring property, nor have they provided sufficient evidence that they are entitled to classification as "other persons" that are entitled to party status under § 6085(c)(1)(E). Thus, their party status requests must be denied in total. Further, given the absence of minimally sufficient evidence to support their assertion of party status under criteria 1 and 8, as conferred by the District Commission, we are compelled to **DENY** their party status in this appeal under those criteria as well. See V.R.E.C.P. 5(d)(2) (noting that an appealing party retains their status from the proceedings below, "unless the Court otherwise determines on its own motion, on motion to dismiss a party, or on a motion to intervene").

**Conclusion**

For all the reasons more fully discussed above, we **DENY** Neighbors' party status requests under Act 250 criteria 1 (dust, water pollution, asbestos, and pollution from hazardous materials), 3 (water supply), 9B (primary agricultural soils), and 10 (town and regional plan). Neighbors have either failed to assert a particularized interest that is protected by those criteria, or they have failed to set forth a sufficient offer of proof that Applicants' proposed project may affect their particularized interests. Conversely, we **GRANT** Neighbors party status under Act 250 criteria 4 (soil erosion, solely as to the excavation work along Route 100), 5 (traffic), 9K (public investment), and 9E (extraction of earth resources). Neighbors have provided concrete evidence of a causal connection between Applicants' project and the interests protected by these criteria such that the proposed project may affect these particularized interests.

For the reasons stated above, we conclude that two of the originally identified Neighbors—James and Linda Murphy—are not entitled to party status under any of the requested Act 250 criteria, and that they are not entitled to retain their party status under criteria 1 and 8, even though the District Commission granted such party status, because they have failed to present adequate written documentation of their claimed life estate, even after Applicants challenged their claim to a life estate interest in the neighboring property.

Accordingly, a trial on the merits will be held to determine compliance with the Act 250 criteria for which Neighbors Patrick Murphy, Penny Cargill, and Deborah Pratt have secured party status by this Decision or at the District Commission below. This includes criteria 1 (noise), 4 (soil erosion), 5 (traffic), 8 (scenic beauty and aesthetics), and 9E (extraction of earth

resources).  A pretrial telephone conference will be scheduled with the Case Manager to discuss the possibility of mediation and, if necessary, to determine the scheduling of trial.  The Court requests that the parties confer, so that they may be prepared to discuss at that conference these and any other anticipated issues.

Done at Newfane, Vermont, this 2nd day of July 2010.

_____
Thomas S. Durkin, Environmental Judge