STATE OF VERMONT

SUPERIOR COURT
ENVIRONMENTAL DIVISION

|  |  |  |
|---|---|---|
| In re Highlands Development Co., LLC | } | |
| and JAM Golf, LLC | } | Docket No. 194-10-03 Vtec |
| Master Plan Application | } | |

Decision and Order on Motion for Reconsideration or to Alter or Amend

Appellant-Applicants Highlands Development Co., LLC and JAM Golf, LLC (Applicants) appealed from a decision of the Development Review Board (DRB) of the City of South Burlington, approving 297 of the 357[1] residential dwelling units sought in Applicants' master plan application for a 450-acre Planned Unit Development. Applicants are represented by Mark G. Hall, Esq. and William A. Fead, Esq.; the City of South Burlington is represented by Amanda S.E. Lafferty, Esq.[2]

Applicants previously moved for summary judgment in this appeal, asking the Court to invalidate several provisions of the 2003 South Burlington Land Development Regulations (2003 Regulations) as being unconstitutionally vague.[3] The Court issued its decision and order regarding Applicants' Motion for Summary Judgment on February 2, 2010. In re Highlands Development Co., LLC and JAM Golf, LLC Master Plan

---

[1] Many of these units have already been constructed or approved, leaving 50 units in four development areas at issue in this appeal. In re Highlands Development Co., LLC and JAM Golf, LLC Master Plan Application, No. 194-10-03 Vtec (Vt. Envtl. Ct. Feb. 2, 2010), slip op. at 8; also see footnote 5 for an explanation of why the number of units was reduced from 358 to 357.

[2] In addition, Marie Ambusk has informational status in this appeal, but has not entered an appearance as a party.

[3] In that motion, Applicants sought invalidation of eight provisions of the 2003 Regulations applicable to their master plan application: § 15.18(A)(4), § 15.18(A)(5), § 15.18(A)(6), § 15.18(A)(10), § 15.18(B)(1), § 15.18 (B)(2), § 15.18 (B)(3), and § 15.18 (B)(4).

<u>Application</u>, No. 194-10-03 Vtec (Vt. Envtl. Ct. Feb. 2, 2010) (the Summary Judgment Decision).

In that decision, the Court granted summary judgment in favor of the City with regard to §§ 15.18(A)(5), (A)(6), and (B)(4) in their entirety, and with regard to §§ 15.18(A)(4), (A)(10), and (B)(2) in certain respects, determining that those specific provisions were not unconstitutionally vague. <u>Id</u>. at 31. The Court granted summary judgment in favor of Applicants with regard to §§ 15.18(B)(1) and (B)(3) in their entirety, and with regard to § 15.18(A)(4) in certain respects, determining that those specific provisions were unconstitutionally vague. <u>Id</u>. With respect to the remainder of §§ 15.18(A)(4), (A)(10), and (B)(2) the Court denied summary judgment on the basis either that material facts had not been provided to the Court or that resolution of the motion was premature at that time. <u>Id</u>. at 31–32.

Applicants moved for reconsideration of the Summary Judgment Decision under V.R.C.P. 59(e). Applicants ask this Court to reconsider its conclusions regarding those sections on which it ruled in favor of the City or ruled that summary judgment was premature (§§ 15.18(A)(4), (A)(5), (A)(6), and (A)(10), and §§ 15.18(B)(2) and (B)(4)), and to conclude that those provisions are unconstitutionally vague.[4] The briefing schedule was extended at the request of the parties; a further extension resulted from the fact that a legible copy of one exhibit was requested by the Court (see note 6 below).

<u>Standard Applicable to a Motion to Alter or Amend a Judgment</u>

Although there is no specific authorization in the civil or environmental rules governing a motion to "reconsider" a decision, the court treats such a motion as one to

---

[4] Applicants also ask this Court to conclude that § 15.18(B)(3) is unconstitutionally vague based on the South Burlington Open Space Strategy. However, as the Court has already granted summary judgment to Applicants that "§ 15.18(B)(3) is too vague to be applied by the court to the contested development areas," <u>id</u>. at 19, it is unnecessary to reach this additional argument for its vagueness.

2

alter or amend a judgment under V.R.C.P. 59(e). In re Appeal of Berezniak, No. 171-9-03 Vtec, slip op. at 3 (Vt. Envtl. Ct. Apr. 6, 2007) (Wright, J.). Vermont Rule of Civil Procedure 59(e), which is substantially identical to Federal Rule 59(e), "gives the court broad power to alter or amend a judgment on motion." Drumheller v. Drumheller, 2009 VT 23, ¶ 28 (quoting V.R.C.P. 59, Reporter's Notes). Rule 59(e) is a codification of the trial court's "inherent power to open and correct, modify, or vacate its judgments." Id. (citing West v. West, 131 Vt. 621, 623 (1973)).[5]

A Rule 59(e) motion "allows the trial court to revise its initial judgment if necessary to relieve a party against the unjust operation of the record resulting from the mistake or inadvertence of the court and not the fault or neglect of a party." Rubin v. Sterling Enterprises, Inc., 164 Vt. 582, 588 (1996) (citing In re Kostenblatt, 161 Vt. 292, 302 (1994)). The limited functions of a motion for reconsideration are "to correct manifest errors of law or fact on which the decision was based, to allow the moving party to present newly discovered or previously unavailable evidence, to prevent manifest injustice, or to respond to an intervening change in the controlling law." In re Vanishing Brook Subdivision, No. 223-10-07 Vtec, slip op. at 4 (Vt. Envtl. Ct. July 10, 2008) (Wright, J.) (quoting 11 Wright, Miller, & Kane, Federal Practice and Procedure: Civil § 2810.1 (2d ed. 1995)); see also Appeal of Van Nostrand, Nos. 209-11-04 & 101-5-05 Vtec, slip op. at 4 (Vt. Envtl. Ct. Dec. 11, 2006) (Durkin, J.). A motion for reconsideration should not be used to "relitigate old matters" or "raise arguments or

---

[5] The Court considers motions for reconsideration or to alter or amend orders resulting from pretrial motions under its "inherent powers to reconsider interim decisions[] so as to avoid error or manifest injustice." In re Mastelli Constr. Application, No. 220-10-07 Vtec, slip op. at 1 (Vt. Envtl. Ct. Nov. 14, 2008) (Durkin, J.), aff'd, Supreme Ct. No. 2009-072 (Sept 4, 2009) (unpub. Mem.); see also In re Sisters & Bros. Inv. Group, LLP, No. 106-5-06 Vtec, slip op. at 1–2, n.1 (Vt. Envtl. Ct. June 27, 2007) (Durkin, J.), aff'd, 2009 VT 58 (stating that "the more appropriate discretionary exercise" with such a motion "is to review it as a more general reconsideration request")(citing Morrisville Lumber Co. v. Okcuoglu, 148 Vt. 180, 182 (1987).

present evidence that could have been raised prior to entry of the judgment." Id. Similarly, mere disagreement between the moving party and the court is not grounds for reconsideration. In re Boutin PRD Amendment, No. 93-4-06 Vtec, slip op. at 1–2 (Vt. Envtl. Ct. May 18, 2007) (Wright, J.).

Applicable Principles of Statutory Construction

In general, as stated in the Summary Judgment Decision, courts are directed to approach regulatory construction in the same manner as statutory interpretation. In re Williston Inn Group, 2008 VT 47, ¶ 14, 183 Vt. 621. In the present case, the Court must apply at least two principles of statutory construction. Applicants argue that the two principles conflict, and that one should take precedence over the other.

The first principle of statutory construction applicable to this case is that the Court should construe the 2003 Regulations "to avoid constitutional difficulties, if possible," In re G.T., 170 Vt. 507, 517 (2000), because a court should "not decide constitutional questions unnecessarily." In re Picket Fence Preview, 173 Vt. 369, 375 (2002) (citing State v. Clarke, 145 Vt. 547, 551 (1985)). Even if "constitutional issues have been argued and briefed, they will not be considered by [the] Court unless disposition of the case requires it." State v. Patnaude, 140 Vt. 361, 368 (1981) (citing In re Wildlife Wonderland, Inc., 133 Vt. 507, 520 (1975)). Therefore, as the Court stated in the Summary Judgment Decision, "where a reasonable alternative for resolution exists, the court will avoid overturning a regulation on constitutional grounds." Summary Judgment Decision at 14 (citing Central Vt. Ry., Inc. v. Dep't of Taxes, 144 Vt. 601, 604 (1984)). This presumption of constitutionality, which is well established under Vermont law, applies when a court analyzes a constitutional challenge to any type of statute or regulation, not just to land use laws.

Another principle of statutory construction, specific to land use regulation, establishes that "[b]ecause land use regulation is in derogation of the common law, any

4

ambiguity is resolved in favor of the landowner." In re Bennington School, Inc., 2004 VT 6, ¶ 12, 176 Vt. 584 (quoting In re Miserocchi, 170 Vt. 320, 324 (2000)). See also, e.g., Kremer v. Lawyers Title Ins. Corp., 2004 VT 91, ¶ 8, 177 Vt. 553 (citing In re Vitale, 151 Vt. 580, 584 (1989)); Appeal of Weeks, 167 Vt. 551, 555 (1998). In the present appeal, if the Court determines that the 2003 Regulations are ambiguous, it must resolve the ambiguity in favor of Applicants.

These two principles of regulatory construction do not necessarily conflict with one another, nor are they necessarily mutually exclusive in practice. Applicants argue that the Court applied the presumption of constitutionality at the expense of the principle that ambiguities are to be resolved in favor of the landowner, claiming that the latter is the "most important statutory-interpretation canon applicable to interpreting land-use regulations." Applicants' Motion for Reconsideration, at 1 (Mar. 5, 2010) [hereinafter Motion for Reconsideration]. However, to the extent possible, the Court considers both principles when analyzing any contested regulations.


Section 15.18(A)(4) of the 2003 Regulations

Section 15.18(A)(4) of the 2003 Regulations requires that:

> The project's design respects and will provide suitable protection to **wetlands, streams, wildlife habitat** as identified in the Open Space Strategy, and any **unique natural features** on the site. In making this finding the DRB shall utilize the provisions of Article 12 of these Regulations related to the wetlands and stream buffers, and may seek comment from the Natural Resources Committee with respect to the project's impact on natural resources.

In the Summary Judgment Decision, the Court held that this section was unconstitutionally vague as it related to "unique natural features," but held that it was constitutional as it related to "wetlands" and "streams" because of the reference to Article 12 of the 2003 Regulations. Summary Judgment Decision at 18. With respect to "wildlife habitat," however, the Court determined that "material facts [were] in dispute,

5

or at least ha[d] not been provided to the Court, to allow the Court to determine whether the Open Space Strategy identifies the 'wildlife habitat' that must be protected and defines what level of protection of wildlife habitat is 'suitable' in this location," as the parties had not provided a copy of the Open Space Strategy. Id. at 18–19.

The Court has now been provided with a legible copy of the Open Space Strategy, an undisputed exhibit that had not previously been provided.[6] In the current motion, Applicants essentially renew their motion for summary judgment with regard to § 15.18(A)(4), only as it relates to protection of "wildlife habitat," on the basis of this newly-provided exhibit.

In order to be upheld as it relates to "wildlife habitat," § 15.18(A)(4), considered together with the Open Space Strategy, must provide sufficient standards for the Court to apply, first, in identifying what "wildlife habitat" is to be protected, and, second, in determining whether the project "respects and will provide suitable protection to" that wildlife habitat. Although the Open Space Strategy does specifically identify and map some wildlife "sightings" and wildlife "corridors" in South Burlington, see Open Space Strategy, at 16–23 (involving "Public Resource Mapping" and the "Natural and Built Resource Inventory"), neither the strategy nor the regulation provides standards for the DRB or this Court to determine when a "project's design respects and will provide suitable protection to" any of the identified wildlife habitats, or, indeed, how to tell how much protection is "suitable." Thus, even considering the Open Space Strategy as having been incorporated by reference[7] in § 15.18(A)(4), that section as it relates to

_____

[6] A photocopied version of this 2002 document, with an illegible legend on each map page, was provided with the memoranda on the present motion; at the request of the Court, a legible copy of the document was filed with the Court on June 17, 2010.

[7] In addition, the paragraph describing "Wildlife Sightings and Corridors" on page 19 of the Open Space Strategy refers the reader for "more detailed information" to yet another document that has not been provided to the Court: "Where the Wild Things

6

"wildlife habitat" does not articulate standards specific enough to guide decisionmakers and applicants in analyzing a proposal. Therefore, § 15.18(A)(4) as it relates to "wildlife habitat" is unconstitutionally vague and unenforceable.

Section 15.18(A)(5) of the 2003 Regulations

Section 15.18(A)(5) of the 2003 Regulations requires that:

The project is designed to be visually compatible with the planned development patterns in the area, as specified in the Comprehensive Plan and the purposes of the zoning district(s) in which it is located.

As stated in the Summary Judgment Decision, in order for § 15.18(A)(5) to be upheld it must lay out "sufficient standards for the Court to apply, first, to identify what the 'planned development patterns' are in the area by looking to the [Comprehensive] Plan and the purposes of the zoning district, and, second, to determine whether the proposed project will be 'visually compatible' with those planned development patterns." Summary Judgment Decision at 21. In the present motion, Applicants do not seek reconsideration of the Court's conclusion that the purpose statement found in § 9.1 of the 2003 Regulations, along with Chapter VII of the Comprehensive Plan, were specific enough to define the "planned development patterns" of the area. Id. at 21–23.

In the Summary Judgment Decision at 24, the Court determined that the standard stated in § 15.18(A)(5) requiring the project to be "visually compatible" with the planned development patterns in the area is a sufficient standard to guide the reviewing body and is not impermissibly vague. Although this is a municipal application rather than one under Act 250, 10 V.S.A. ch. 151, and although expert testimony may be required on visual compatibility, the Court ruled that the "visually

Are: Large Mammal Habitats and Corridors in South Burlington, Vermont," apparently published by the Winooski Valley Park District.

compatible" component of § 15.18(A)(5) could be analyzed in the context of the first prong of the so-called Quechee Lakes test. First articulated by In re Quechee Lakes Corp., Permit Nos. 3W0411-EB & 3W0439-EB, Findings of Fact, Concl. of Law, & Order, at 18–20 (Vt. Envtl. Bd. Nov. 4, 1985), this test "guides a reviewing body in determining a project's compatibility with the surrounding area by asking: 'Will the proposed project be in harmony with its surroundings—will it "fit" the context in which it will be located.'" Summary Judgment Decision at 24. The Court concluded that the "historical usage" of the first prong of the Quechee Lakes test "provides adequate guidance to a reviewing body in applying § 15.18(A)(5)." Id. Applicants seek reconsideration of the concept that the first prong of the Quechee Lakes test can be used to provide guidance when applying the "visually compatible" component of § 15.18(A)(5). Motion for Reconsideration, at 16–17.

Applicants argue that the "compatibility" standards found within the first prong of the Quechee Lakes test have "vitality . . . only in conjunction with six other subcriteria for just making the determination as to whether the impact of development is adverse." They argue that the "compatibility" component of the Quechee Lakes test is not a "standard unto itself" that may be used under § 15.18(A)(5). Motion for Reconsideration at 16. The Court did not intend to suggest that the compatibility component of the Quechee Lakes test should be applied directly to this municipal decision. Rather, the existence of the Quechee Lakes compatibility analysis, already well-established by the time the 2003 Regulations were adopted, shows that visual compatibility is a concept that can be applied by the decisionmaker, even if expert evidence is necessary for that purpose.

Thus, when applied in light of the guidance offered by the history of Quechee Lakes analysis, and expecting expert evidence on visual compatibility to assist the Court, § 15.18(A)(5) is not unconstitutionally vague and unenforceable. Applicants' motion to reconsider is denied as to § 15.18(A)(5).

<u>Section 15.18(A)(10) of the 2003 Regulations</u>

Section 15.18(A)(10) of the 2003 Regulations requires that the project be "consistent with the goals and objectives of the Comprehensive Plan for the affected district(s)," in the present case, the Southeast Quadrant.

Applicants first argue that § 15.18(A)(10) is unenforceable because "the Vermont Supreme Court has already held that the applicable [Comprehensive] Plan is unenforceable." Motion for Reconsideration, at 8 (citing <u>In re Appeal of JAM Golf, LLC</u>, 2008 VT 110, ¶ 18, 185 Vt. 201). This argument overstates the Supreme Court's holding as to the South Burlington Comprehensive Plan in <u>Appeal of JAM Golf</u>.[8] In that case, it is essential to note that the Vermont Supreme Court first concluded that municipalities do have authority to require proposed projects "to conform to their city plan" as long as there is a "specific policy set forth in the plan," and that policy is "stated in language that is clear and unqualified, and creates no ambiguity." <u>Appeal of JAM Golf</u>, 2008 VT 110, ¶¶ 16-19 (quoting <u>In re John A. Russell Corp.</u>, 2003 VT 93, ¶ 16, 176 Vt. 520). See also, e.g., 24 V.S.A. § 4414(3)(A)(ii) (defining the character of an area, for the purposes of conditional use approval, by the "<u>specifically stated policies and standards</u> of the municipal plan" (emphasis added)). Thus, the City had authority to enact § 15.18(A)(10); the issue for analysis is instead whether the Comprehensive Plan is sufficiently specific and unambiguous as to any applicable goal or objective.

In analyzing municipal regulations that require conformance with a municipal plan such as the South Burlington Comprehensive Plan, the Supreme Court has declined to apply any provision of the plan that "sets forth an abstract policy . . . but provides no specific standards to enforce the policy, or is at best, ambiguous and in conflict with applicable zoning provisions." <u>John A. Russell Corp.</u>, 2003 VT 93, ¶ 17

---

[8] Although the City adopted a revised Comprehensive Plan in 2006, the master plan application that is the subject of the present appeal is to be reviewed under the 2001 Comprehensive Plan, the same Comprehensive Plan at issue in <u>Appeal of JAM Golf</u>.

9

(internal citations and quotations omitted). See also, e.g., Appeal of JAM Golf, 2008 VT 110, ¶ 17 ("[C]ity authorities may not deny permission for a project when there is not a 'specific policy set forth in the plan.'" (quoting John A. Russell Corp., 2003 VT 93, ¶ 16). Based on this reasoning, in Appeal of JAM Golf the Supreme Court concluded that certain "aspects" of the Comprehensive Plan were "too ambiguous to be enforceable." Id. at ¶¶ 18–19. Specifically, the Court held that the provisions of the Comprehensive Plan requiring proposed projects to "protect wildlife corridors and habitat" and "protect scenic views," in combination with the plan's "general policy of promoting growth and residential development in the Quadrant," were vague and unenforceable as applied to the Taft Subdivision development area under the 2002 Regulations. Id.

On the other hand, the Supreme Court did not hold that the Comprehensive Plan as a whole was unconstitutionally vague and unenforceable, and did not conduct a constitutional analysis regarding any other provisions of the Comprehensive Plan as no other provisions were at issue in that appeal. Accordingly, it is appropriate for this Court to consider other aspects of the Comprehensive Plan, not specifically struck down by the Supreme Court in Appeal of JAM Golf, as applied to the four development areas at issue in the present master plan application. It is also appropriate for this Court to limit its analysis to only those provisions of the Comprehensive Plan that are specifically at issue in the present appeal, just as the Supreme Court limited its analysis in Appeal of JAM Golf.[9]

---

[9] As this Court discussed in the Summary Judgment Decision at 28, to pronounce on the constitutionality of the 2001 Comprehensive Plan as a whole, or on any other provisions of the Comprehensive Plan not at issue regarding Applicants' master plan application, would require the Court to rule on an unnecessary constitutional issue and would constitute an improperly advisory opinion. See In re Picket Fence Preview, 173 Vt. 369, 375 (2002) (stating that courts should "not decide constitutional questions unnecessarily")(citing Clarke, 145 Vt. at 551). See also State v. Patnaude, 140 Vt. 361, 368 (1981) (stating that constitutional issues "will not be considered by this Court unless disposition of the case requires it") (citing Wildlife Wonderland, 133 Vt. at 520).

10

Applicants also incorrectly characterized the Summary Judgment Decision as having "<u>affirmed</u> the DRB's conclusion that the 'west-to-east layout' proposed by the Heatherfields/Lot 108 area and the 'installation of road infrastructure across this area directly contradicts the Comprehensive Plan.'" Motion for Reconsideration, at 8 (emphasis added). To the contrary, in the Summary Judgment Decision, the Court did not even reach the merits of the application under § 15.18(A)(10), much less "affirm" any of the DRB's conclusions.[10] Rather, the Court only reached the issue of whether the specific goals and objectives of the Comprehensive Plan for the Southeast Quadrant relating to the lot layout and road infrastructure of the Heatherfields/Lot 108 area were specific enough to withstand a constitutional challenge. All the Court concluded was that the Comprehensive Plan provisions were sufficiently specific to be applied to the lot layout and road infrastructure of the Heatherfields/Lot 108 area on the merits of the master plan application. Summary Judgment Decision at 29. The Court did not reach a decision on the merits of the master plan application under § 15.18(A)(10) or any other provision of the 2003 Zoning Regulations. The issue of whether the master plan application, as to the lot layout and road infrastructure of the Heatherfields/Lot 108 area, is "consistent with the goals and objectives of the Comprehensive Plan for the [Southeast Quadrant] district" will be determined when the Court considers the merits of the application. Further, as discussed in the Summary Judgment Decision, "[i]f any

---

[10] In any event, by statute and rule, Applicants' appeal in this Court is <u>de novo</u>. V.R.E.C.P. 5(g); 10 V.S.A. § 8504(h). The Court does not review the DRB decision and does not affirm (or reverse) any of its conclusions. Rather, the Court applies "the substantive standards that were applicable before the tribunal appealed from" and reaches an independent decision on the merits of those aspects of the master plan application raised by the Statement of Questions. 10 V.S.A. § 8504(h); V.R.E.C.P. 5(g). In a <u>de novo</u> appeal such as this one, the Court "hear[s] the evidence anew 'as if it had not been heard before and as if no decision had been previously rendered.'" <u>In re Godnick Family Trust Permit & Variance Application</u>, No. 52-4-09 Vtec, slip op. at 5 (Vt. Envtl. Ct. Jan. 6, 2010) (Durkin, J.) (quoting <u>State v. Madison</u>, 163 Vt. 360, 370 (1995)).

other elements of the goals and objectives of the Comprehensive Plan for the Southeast Quadrant are sought to be applied by the City to the merits of any of the four contested development areas, the constitutional vagueness analysis [of § 15.18(A)(10)] will have to be addressed, as applied, at that time. Summary Judgment Decision at 30.

Therefore, Applicants' motion to reconsider is denied as to § 15.18(A)(10).

Section 15.18(B)(2) of the 2003 Regulations

Section 15.18(B)(2) of the 2003 Regulations requires that:

Building lots, streets and other structures shall be located in a manner that maximizes the protection of open character, natural areas, and scenic views of the Quadrant identified in the Comprehensive Plan, while allowing carefully planned development at the overall base densities provided in these Regulations.

As the Court stated in the Summary Judgment Decision at 25, in order for § 15.18(B)(2) to survive constitutional scrutiny, it must provide sufficient standards for the Court to apply to determine what open character, natural areas, or scenic views of the Southeast Quadrant are identified in the Comprehensive Plan. It also must provide sufficient standards to allow the Court to determine whether the lot layout, that is, the location of building lots, streets, and other structures, "maximizes the protection" of those listed features." However, to avoid reaching an unnecessary constitutional question, the Court declined to rule on summary judgment as to the constitutionality of § 15.18(B)(2), until or unless the protection of "open character," "natural areas" or "scenic views" would actually be argued to be applicable to the merits of any of the four contested development areas. Id. at 25–26.

In the present motion, Applicants reiterate their argument that § 15.18(B)(2) should be struck down as unconstitutionally vague on its face. Applicants continue to disagree that the term "maximize" can ever be sufficiently definite to establish a required degree of protection."

12

The Court has fully considered this argument and declines to alter its decision to refrain from ruling on the constitutionality of § 15.18(B)(2) on its face, because neither party appears to claim that § 15.18(B)(2) is applicable to the merits of any of the four contested development areas. Unless and until the features listed in § 15.18(B)(2)—as to the "open character," "natural areas" or "scenic views" of one of the contested development areas—are applicable to the Court's consideration of the master plan application as to the four contested development areas, the Court declines to rule on the constitutionality of that provision. See note 9, above. Accordingly, Applicants' motion to reconsider is denied as to § 15.18(B)(2).

Sections 15.18(A)(6) & 15.18(B)(4) of the 2003 Regulations

Section 15.18(A)(6) of the 2003 Regulations requires that:

**Open space areas** on the site have been located in such a way as to maximize opportunities for creating contiguous open spaces between adjoining parcels and/or stream buffer areas.

Section 15.18(B)(4) of the 2003 Regulations requires that:

Consistent with [§ 15.18(B)(1) through (3)], dedicated open spaces shall be designed and located to maximize the potential for combination with other open spaces on adjacent properties.

In the Summary Judgment Decision, the Court characterized both of these sections as "focus[ing] on preserving the potential for creating contiguity of open space on the project property with open space on adjacent property," and distinguished them from the quite different issue of "convenient allocation and distribution of common open space" struck down in Appeal of JAM Golf, LLC, No. 69-3-02 Vtec, slip op. at 5-6 (Vt. Envtl. Ct. June 12, 2009). Summary Judgment Decision at 19.

The Court has reviewed the parties' arguments and the reasoning of the Summary Judgment Decision, and declines to change the Summary Judgment Decision as to §§ 15.18(A)(6) and (B)(4) of the 2003 Regulations. The Court is able to determine

13

from the plain language of these sections that the resource to be protected is the potential or opportunity for making any open space on the project property continuous with open space, including stream buffers, existing on adjacent property. The Court is also able to determine from the plain language of these sections that the degree of protection is to "maximize" that potential, that is, to ensure to the greatest extent possible that development and open space on the site are located so as to avoid blocking the future opportunity to link such open space with open space existing on adjacent property.

The Court therefore declines to alter its conclusion that §§ 15.18(A)(6) and (B)(4) are sufficiently definite to be applied by the Court to the contested development areas.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that Applicants' Motion for Reconsideration or to Alter or Amend is Granted as to § 15.18(A)(4) with respect to "wildlife corridors," as discussed above, and is otherwise denied. A telephone conference has been scheduled (see enclosed notice) to discuss the issues that remain in this appeal after the resolution of the motions, to discuss whether mediation of any of those issues might now be appropriate, and to discuss the scheduling of this matter for trial.

Done at Berlin, Vermont, this 21st day of September, 2010.

_____

Merideth Wright
Environmental Judge